# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Watson**, 2012 IL App (2d) 091328

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TROY S. WATSON, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-09-1328 |
| Filed | January 25, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for residential burglary was reversed and the cause was remanded for a new trial with new counsel where defendant's trial counsel was ineffective in failing to cross-examine the State's DNA expert or present evidence that the partial profile should be considered a "nonmatch," failing to present expert testimony that the statistical calculations relied on by the State were flawed, and failing to understand the DNA evidence or ensure that it was properly explained to the jury, and defendant's posttrial counsel was ineffective in only filing a notice of appeal without filing any postsentencing motions. |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 08-CF-1692; the Hon. Joseph G. McGraw, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on Appeal

Thomas A. Lilien and Linda A. Johnson, both of State Appellate Defender's Office, of Elgin, for appellant.

Joseph P. Bruscato, State's Attorney, of Rockford (Stephen E. Norris and Timothy J. Ting, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

PRESIDING JUSTICE JORGENSEN delivered the judgment of the court, with opinion.

Justice Burke concurred in the judgment and opinion.

Justice Birkett dissented, with opinion.

## OPINION

¶ 1        Following a jury trial, defendant, Troy S. Watson, was convicted of residential burglary (720 ILCS 5/19-3(a) (West 2006)). On December 3, 2009, the trial court denied defendant's *pro se* posttrial motion alleging, in part, ineffective assistance of counsel based on counsel's failure to challenge the allegedly marginal statistical significance of admitted deoxyribonucleic acid (DNA) evidence. On December 10, 2009, the court sentenced defendant to 30 years' imprisonment. Defendant did not file a postsentencing motion.

¶ 2        On appeal, defendant argues that both trial and posttrial counsel provided ineffective assistance. Specifically, defendant asserts that, where the only evidence the State produced against him constituted a partial DNA "match," trial counsel provided ineffective assistance in that she did not: (1) cross-examine the State's DNA expert or present any evidence regarding the fact that the partial profile should be considered a "nonmatch" and was not, in fact, unique; (2) present any expert testimony to establish that the statistical calculations relied upon by the State and its expert were flawed; and (3) understand the DNA evidence or ensure that it was properly explained to the jury. As to posttrial counsel, defendant asserts that counsel provided ineffective assistance where he was appointed for the purpose of filing postsentencing motions but, instead, filed only a notice of appeal. For the following reasons, we conclude that defendant was denied the effective assistance of trial counsel. We reverse his conviction and remand for a new trial with new counsel. We do not reach the issue of whether posttrial counsel was ineffective.

¶ 3                                    I. BACKGROUND

¶ 4        On August 17, 2007, Anna Berman was house-sitting for her boyfriend's uncle, Craig Corcoran. When she arrived at Corcoran's residence, the back door was ajar and, inside,

-2-

items were disturbed and various belongings were missing. The items stolen from the residence included a laptop computer, a video game system, and a flatscreen television. Berman telephoned the police.

¶ 5    The police investigation revealed that a patio chair was pulled under a bathroom window; the bathroom storm window was removed and broken, the interior window was pried open, and it appeared that the screws on the window lock were unscrewed to gain entry to the home through the bathroom. No usable fingerprints were recovered from the window, bathroom, or remainder of the house. A tennis shoe or other footwear imprint was found on the toilet seat underneath the entry window; a lift of the print was not tied to defendant. Police collected small hairs found on the broken glass of the window and a screwdriver (which did not belong to Corcoran) found in the master bedroom and sent them to be tested by the State Police crime lab for possible DNA evidence.

¶ 6    Approximately 16 months later, on December 31, 2008, a buccal swab was used to collect defendant's DNA.

¶ 7    Blake Aper, a forensic scientist employed by the State Police, testified that he performed DNA analyses comparing defendant's DNA with the DNA collected from the screwdriver and hairs recovered from the crime scene. In approximately 36 pages of trial transcript, Aper was admitted as an expert in DNA analysis, he explained generally what DNA is and how the analysis works, and he explained that the laboratory types 13 loci on the DNA to create a profile.[1] The laboratory prefers to have a minimum of three nanograms of DNA to profile. Further, Aper explained that, while buccal swabs taken from individuals typically result in full 13-loci DNA profiles, it is not expected that full profiles will be recovered from samples left at crime scenes. DNA information from such a sample can be lost due to environmental factors, if someone was wearing gloves when handling the item from which the sample was recovered, if the source of the sample is not a "good DNA shedder," if that individual did not handle the item for a long period or did not handle it roughly, or if the item does not have a good surface onto which to transfer DNA.

¶ 8    Aper testified specifically regarding the samples collected from the crime scene as compared to defendant's DNA. First, as to the screwdriver, Aper explained that the swab recovered only 1.1 nanograms of DNA. From that low-level sample, Aper was able to obtain information from only 3 loci, as opposed to the 13 loci normally viewed. Aper concluded that the sample contained a mixture of more than one person's DNA. He compared defendant's DNA to the three loci and excluded defendant as having contributed to the sample.

¶ 9    Next, as to the hairs recovered from the window, Aper testified that the sample

---

[1]In Illinois, DNA analysts routinely analyze 13 loci. See *People v. Barker*, 403 Ill. App. 3d 515, 527 (2010) (discussing the process of DNA analysis and noting that DNA analyst performed tests to create a profile across "13 core loci"); see also *People v. Williams*, 238 Ill. 2d 125, 149 (2010) (analyst tested "the 13 loci"); *In re Jessica M.*, 399 Ill. App. 3d 730, 745-48 (2010) (noting that the Federal Bureau of Investigation (FBI) maintains a DNA index system with input from state databases, including Illinois, and that there the FBI analyzes 13 loci to compare unknown profiles obtained from crime scenes with known profiles in the database).

constituted 2½ nanograms of DNA. Again, Aper was not able to get a full profile from all 13 loci; rather, the sample allowed him to obtain information from only 7 of the 13 loci. Aper compared defendant's DNA standard to the seven-loci DNA profile recovered from the window. He concluded that he "was not able to exclude [defendant] as contributing to that stain."

¶ 10    To explain his process, Aper prepared, and the jury was shown, charts reflecting defendant's DNA profile and the types Aper obtained from the screwdriver and the hairs from the window. Aper explained that, on each chart, there were markings reflecting the 13 DNA loci. At each locus, there was a notation reflecting the type obtained at that locus, and if there was no DNA recovered at a locus, there was a notation reflecting that. Aper then demonstrated for the jury how the chart reflecting the types recovered from the screwdriver compared with defendant's profile such that defendant could be excluded as having contributed to the mixed sample. Aper next explained the comparison process and results obtained when comparing defendant's DNA profile to the seven-loci profile recovered from the hairs:

> "I look at the first location. There's a 1618; [defendant is] a 1618. Second location, 1417; he's a 1417. Third location, 1921; he's a 1921. Fourth location, 1213; he's a 1213. This [fifth] location 2931.2; he is a 2931.2. Since there is no information in my crime scene profile at this location, no comparisons really happen here. So I go down to here, this D5 [sixth location] where there's a 1012, [defendant] has a 1012.

> This D13 [seventh] location I have a type 10, and he has a 1013. So he's got some. There is one type that's consistent with this profile, but I did not observe the 13 there. But the problem is when we get low level DNA samples, sometimes we have information below, let's say, our threshold for analysis. And that's what happens sometimes we get, let's say, our threshold is set at 150; and that's just telling you how high–how much DNA is there. For a threshold of 150, sometimes you can have information below our threshold, and that doesn't show up on the chart. So this information here was strong enough for me that I could not exclude him as a contributor because it's possible that a 13 is at this location, but it's below our threshold."

Aper was asked, "[W]ith regard to the DNA swabbing from the window, which you said the defendant cannot be excluded, what are the odds of finding that DNA profile in the general population?" (Presumably, such that, like defendant, someone else's DNA would, at those seven loci, match the profile from the hairs on the window.) He replied: "Approximately 1 in 1.4 billion black, 1 in 103 million white, and 1 in 170 million Hispanic individuals cannot be excluded from having contributed to that stain." As defendant is a white male, "you would have to sample roughly 103 million white people to find someone that also cannot be exclude[d] from that profile from that window." Aper testified that he had checked earlier that morning, and the population of the United States is roughly 307 million people.

¶ 11    Defense counsel's entire cross-examination of Aper follows:

> "COUNSEL: Mr. Aper, you were just testifying about a general population, people in the general population. Your findings then take into consideration only people who are unrelated to [defendant]; is that correct?

APER: That's correct.

COUNSEL: And that's because people who are related share similar types of DNA?

APER: Yes. That's possible."

¶ 12    On re-cross, defense counsel clarified that, while only identical twins would share exactly the same DNA at *all* 13 levels, a relative might share *some* levels.

¶ 13    Outside the presence of the jury, defense counsel noted that defendant wanted her to cross-examine Aper on the fact that defendant became a suspect in this case as a result of, as counsel put it, a "hit" in the State's database of convicted felons (which contained defendant's DNA profile). The court agreed with counsel that informing the jury that defendant was a convicted felon would not have been helpful to his case. Defendant's motion for a directed verdict at the close of the State's case was denied. Defendant presented no evidence.

¶ 14    In closing, defense counsel highlighted that the sole piece of evidence the State presented to link defendant to the burglary was the DNA evidence recovered from the hairs on the window. She reminded the jury that: (1) there were no eyewitnesses; (2) no fingerprints were recovered; (3) there was no evidence linking the bathroom footprint to defendant; (4) the DNA testing of the screwdriver that was presumably used during the break-in did *not* match defendant; and (5) no stolen property was traced back to him. As to the DNA recovered from the hairs, counsel noted that Aper testified only that defendant could not be excluded as having contributed to that sample; "[i]t's not a perfect match." Counsel also noted that, of the 13 loci that are supposed to be profiled, 4 loci were not profiled or tested. She summarized that, of the nine loci that were profiled, "only seven were a match to [defendant]. *** Just over half the DNA match is what we have here." Counsel argued that other people in the general population, including someone related to defendant, might have contributed to the sample.

¶ 15    The State, in its opening and rebuttal closing arguments, argued that Aper analyzed the evidence and found it "to match defendant." The State noted that Aper testified that defendant's DNA profile would occur one time in 103 million white males, and given that the population of the United States is just over 300 million people, that means that only 3 people in the United States would have that profile. "So what is the likelihood of two other people other than the defendant happening to be in Rockford at Craig Corcoran's house and leaving their DNA behind?"

¶ 16    On August 11, 2009, the jury found defendant guilty of residential burglary. On December 10, 2009, at sentencing, the State highlighted for the court defendant's criminal history, including multiple convictions of residential burglary and possession of a controlled substance and that defendant "has pretty much been incarcerated in the Department of Corrections or jail since August of 1988." Defendant proceeded *pro se* at the sentencing hearing. In his statement in allocution, defendant informed the court that he was involved in spiritual and other programs. Further, defendant stated:

"I know my past is anything but good to look at. I can even understand why the State's asking for what they are. I don't want to sit here and make excuses for anything. *** I guess I don't want to make excuses because I can understand where the State's

-5-

coming from and everything from what they've presented \*\*\* I know no matter what sentence you send forth is going to be less than what I deserve. \*\*\* I would ask for forgiveness from all those that I have harmed. In the sense that in the past I may have been able to justify my actions, I cannot do that today, other than what I can believe in, this is my life, Jesus Savior paying for my sins."

Defendant's prior record rendered him eligible for Class X sentencing, and the court sentenced defendant to the maximum sentence of 30 years' imprisonment.

¶ 17 Defendant agreed to allow the court clerk to file on his behalf a notice of appeal challenging his conviction. The trial court advised defendant that, if he wished to appeal his sentence, he must file with the trial court a written motion to reconsider the sentence. Defendant asked to make an oral motion, but the court instead asked defendant if he wanted an attorney to assist "in preparing any written motions challenging the sentence of the sentencing hearing"; defendant answered affirmatively. The court stated that it would appoint an attorney to "represent [defendant] on those motions." The record reflects that, the same day, the court issued a notice to posttrial counsel, informing him of his appointment to represent defendant for "filing of ~ [*sic*] defendant's postsentence motions." No postsentence motions were filed. Rather, one week later, posttrial counsel filed on defendant's behalf a notice of appeal.

¶ 18                                   II. ANALYSIS
¶ 19                       A. Ineffective Assistance–Trial Counsel

¶ 20 Defendant argues that trial counsel's performance constituted ineffective assistance where she failed to convey to the jury the insignificance of his DNA matching the crime-scene DNA at only seven loci. Defendant notes that counsel failed to present any evidence, through cross-examination or the presentation of witnesses, reflecting that a finding based on a profile of fewer than 13 loci is unreliable. He argues that, at the time of his trial, such evidence was available and that counsel's demonstrated lack of knowledge reflects that she did not investigate the issue. Defendant argues that counsel's actions cannot be considered sound trial strategy and that no reasonably effective defense attorney presented with the same circumstances would engage in similar conduct. As the State's prosecution against him was based entirely on the DNA evidence and his conviction rested solely on Aper's testimony, defendant argues that, if counsel had presented evidence to show that the partial "match" was insignificant, there is a reasonable probability that the result of the trial would have been different. Defendant requests that we reverse his conviction and remand the case for a new trial with different counsel.

¶ 21 A defendant may raise an ineffective-assistance claim on direct appeal when the basis of the claim can be ascertained from the record. See, *e.g.*, *People v. Phillips*, 383 Ill. App. 3d 521, 544-45 (2008) (addressing claims that could be ascertained from the record (counsel's failure to request a jury instruction on a lesser included offense), but declining to address claims that required consideration of matters outside the record (counsel's failure to introduce into evidence a report not in the record)). Here, defendant's ineffective-assistance claim challenges counsel's on-the-record performance or, more importantly, her absence of

performance. See, *e.g.*, *People v. Foster*, 168 Ill. 2d 465, 480 (1995) (noting in a postconviction setting that certain allegations regarding an attorney's *failures* to perform constituted claims for which facts were contained in the trial record and could have been raised on direct appeal). Specifically, posttrial, defendant in his *pro se* capacity challenged counsel's lack of cross-examination of the State's DNA expert, her failure to present any evidence to challenge the DNA evidence, and the overall effectiveness of her efforts regarding that evidence. Therefore, we can ascertain from the record whether counsel's performance (for example, the extent of counsel's cross-examination of the State's key witness, counsel's statements to the jury regarding a "match," and the fact that she called no witnesses) fell below an objective standard of reasonableness and caused defendant prejudice. Contrary to the dissent's assertions, addressing defendant's claim is proper.[2]

¶ 22    The sixth amendment guarantees an accused in a criminal prosecution the right to assistance of counsel. U.S. Const., amend. VI. The right to counsel encompasses the right to *effective* counsel; " 'the essential aim of the amendment is to guarantee an effective advocate for each criminal defendant.' " *People v. Holmes*, 141 Ill. 2d 204, 218 (1990) (quoting *Wheat v. United States*, 486 U.S. 153, 159 (1988)). The appropriate focus in evaluating a sixth amendment claim is the adversarial process. *Id.* at 217. More specifically, a defense attorney has an "overarching duty" to advocate for his or her client's case and to use his or her skills and knowledge to render the trial a reliable adversarial process. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). The constitutional guarantee of effective counsel contemplates that, to render the trial a reliable adversarial process, counsel will engage evidentiary rules to shield his or her client from a decision based on unreliable evidence (*People v. Moore*, 279 Ill. App. 3d 152, 159 (1996)) and will appreciate and understand the legal principles applicable to the case (*People v. Faulkner*, 292 Ill. App. 3d 391, 394 (1997)). Further, "[i]t contemplates assistance ready to provide an adversarial check to a prosecutor's excessive endeavors." *People v. Fletcher*, 335 Ill. App. 3d 447, 453 (2002).

¶ 23    When a defendant argues that counsel's performance was ineffective, he or she must show both that: (1) the attorney's performance fell below an objective standard of reasonableness (deficient performance prong); and (2) there is a reasonable probability that, but for the attorney's deficient performance, the outcome of the trial would have been different (prejudice prong). *Strickland*, 466 U.S. at 687; *People v. Villareal*, 198 Ill. 2d 209, 228 (2001). To succeed on an ineffective-assistance claim, both *Strickland* prongs must be satisfied. *Strickland*, 466 U.S. at 687; *People v. Williams*, 181 Ill. 2d 297, 320 (1998). A reasonable probability is a probability sufficient to undermine confidence in the outcome; specifically, that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. *People v. Enis*, 194 Ill. 2d 361, 376 (2000).

¶ 24    There is a strong presumption that an attorney's performance falls within the wide range

---

[2]Further, our reference, later in this analysis, to certain scholarly sources reflects merely the existence of various arguments that counsel could have used, not that counsel should have introduced those specific sources into evidence. Accordingly, those sources do not constitute off-the-record evidence precluding consideration of defendant's claim.

of reasonable professional assistance. Trial strategy cannot be a basis for finding counsel ineffective. See *People v. Smith*, 177 Ill. 2d 53, 93 (1997). However, the presumption that the challenged action or inaction was the product of sound trial strategy may be overcome where no reasonably effective defense attorney, confronted with the circumstances of the defendant's trial, would engage in similar conduct. *Fletcher*, 335 Ill. App. 3d at 453. Our review of defendant's ineffective-assistance claim is bifurcated: we defer to the trial court's findings of fact unless they are contrary to the manifest weight of the evidence, but we assess *de novo* the ultimate legal issue of whether counsel's act or omission supports an ineffective-assistance claim. *People v. Bailey*, 375 Ill. App. 3d 1055, 1059 (2007). For the following reasons, we conclude that, here, both *Strickland* prongs are met.

¶ 25    First, we conclude that counsel's performance fell below an objective standard of reasonableness. Counsel failed to effectively challenge the meaning or significance of Aper's conclusions based on only a partial-profile comparison. Specifically, Aper's testimony explained that he could compare defendant's DNA with only seven loci on the hair DNA. Counsel neither argued nor presented any evidence challenging the reliability of a partial-profile comparison. Nor did counsel probe the accuracy of Aper's testimony of the statistical probabilities ("1 in 1.4 billion black, 1 in 103 million white, and 1 in 170 million Hispanic individuals") of finding in the general population another profile similar to defendant's such that it would match the hair DNA at those seven loci. At the time of trial, however, viable arguments or evidence challenging the significance of Aper's findings could have been made.[3]

¶ 26    For example, as to the significance of a "match" at fewer than 13 loci, one legal scholar has explained that matching at fewer than 13 loci will *exclude* a suspect if it can be determined that there is no match at the remaining available loci. "When the same thirteen loci can be typed in a crime-scene sample, a mere nine-[loci] match will not generate a suspect. In fact, the discrepancies in the full profile at the other four loci will exclude a suspect as a possible source of crime-scene DNA." David H. Kaye, *Trawling DNA Databases for Partial Matches: What Is the FBI Afraid Of?*, 19 Cornell J.L. & Pub. Pol'y 145, 153-54 (2009). Here, counsel did not press Aper or present evidence regarding the theoretical possibility that, if defendant's DNA profile were found to match the hair DNA at seven loci, but to *not* match at any of the six missing loci, defendant likely would be *excluded* as the source of the crime-scene DNA. In fact, Aper's explanation of the chart comparison reflects that, at the seventh locus, Aper could not with certainty state that defendant matched; "[t]his D13 [seventh] location I have a type 10, and he has a 1013. So he's got some. There is one type that's consistent with this profile, but I did not observe the 13 there." Aper explained that it was *possible* that defendant would match at that locus, but

[3]To support his argument that counsel's inaction was unreasonable, defendant directs our attention to *People v. Wright*, No. 1-07-3106 (Ill. App. Mar. 26, 2010). On June 3, 2011, after briefing in this appeal was complete, the *Wright* decision was withdrawn. Accordingly, we grant the State's motion to strike the portions of defendant's briefs that rely on that authority, and we do not consider the holding in *Wright* for this disposition. However, we nevertheless find useful to our analysis some of the literature summarized therein.

-8-

that the threshold of the sample was simply too low to opine with certainty. Counsel did not highlight this discrepancy to the jury or examine Aper on the fact that, at one of the seven loci, he could not claim a match and, therefore, concluded only that defendant could not be excluded as a contributor, *not* that defendant *was a match*. Instead, while counsel in closing argument reminded the jury that not all 13 loci that are routinely profiled were available, she stated that "seven were a match to [defendant]. *** Just over half the DNA match is what we have here." Counsel did not, however, through evidence or argument, develop for the jury that the missing loci could be critical and, in fact, exculpatory. While it was up to the jury to decide what weight to give a match at "over half" of a full DNA profile, counsel did not present the jury with any information *against* which to weigh that evidence.

¶ 27      The error created by the absence of argument or evidence challenging the strength of a partial match is compounded by the absence of any argument or evidence challenging the statistical significance of a partial match. The statistical probability of finding a DNA profile in the general population is a critical step in DNA analysis. See *People v. Miller*, 173 Ill. 2d 167, 185 (1996) ("For a [DNA] match to be meaningful, a statistical analysis is required. The statistical analysis determines the frequency in which a match would occur in a database population."). Here, Aper's testimony regarding the statistical probability of finding in the general population a match to defendant's DNA (such that it would, at the relevant seven loci, match the partial profile from the crime scene) was unchallenged. However, studies of various states' databases collecting offenders' DNA profiles have led legal scholars and mathematicians to doubt the alleged low probability of encountering a random, partial-profile "match" in the general population.

¶ 28      For example, a 2005 study of the offender database in Arizona revealed that, *within* the database of 65,493 profiles, there were 122 pairs of profiles that matched at 9 loci (but did not match at the other 4 loci), and another 20 pairs that matched at 10 loci (and did not match at the remaining 3 loci). Kaye, *supra*, at 154. In other words, more than 284 individuals had the same information (more specifically, alleles) at nine loci as at least 1 other individual in the database. These findings prompted commentary that, if the frequency "for a nine-locus match is anything like one in 754 million for whites, and one in 561 million for blacks [as some DNA experts testify], how can it be that a database as small as [Arizona's with] a mere 65,493 entries produces even one such match?" (Internal quotation marks omitted.) Kaye, *supra*, at 155. Similar results have been discovered in the offender databases in Maryland (32 pairs of 9-loci matches within a database of 30,000 profiles) and, apparently, California (among 65,000 profiles, there were 122 pairs that matched at 9 of the 13 loci). See Ken Strutin, *Databases, E-Discovery and Criminal Law*, 15 Rich. J.L. & Tech. 6, 54 (2009).[4] Legal scholars and scientists have further questioned whether the "extraordinarily large" figures used in court to estimate the probability of a random match in the general population are "no better than alchemy," and one mathematician has called such numbers " 'total nonsense' " and " 'a damned lie' " and has stated that admitting this testimony in court is

[4]It appears that a similar study has been conducted of the Illinois offender database. See, *e.g.*, Strutin, *supra*, at 48-51. Those results were published in the withdrawn *Wright* decision; however, we do not have those results before us.

" 'disgraceful' " and that courts " 'may as well admit alchemy and astrology.' " Kaye, *supra*, at 145, 147 (quoting Keith Devlin, *Damned Lies* (Oct. 2006), http://www.maa.org/devlin/devlin_10_06.html). Nevertheless, other than to suggest that one of defendant's relatives might have DNA similar to defendant, the defense presented no evidence or even *argument* that Aper's figures, given that they were based on only a partial-profile comparison, might be inaccurate.

¶ 29    The State argues that counsel did not perform unreasonably, because: (1) her decisions were strategic; (2) the methods and statistical analyses Aper employed have been found reliable in other cases (*e.g.*, *Miller*, 173 Ill. 2d at 189); and (3) convictions have, in other cases, been upheld based on matches at fewer than seven loci.[5] Thus, the State concludes that, given the established precedent of the reliability of DNA evidence with loci profiles either equal to or with fewer than the seven here, defendant was provided with competent representation.

¶ 30    Extending this argument and taking it to its logical conclusion, the State suggests that a defense counsel may be excused for not subjecting the State's DNA evidence (here, the only evidence offered against defendant) to adversarial testing if the methods used or results found have been upheld in another case. We reject this argument. Simply put, the issue on appeal here concerns *advocacy*, not admissibility. We are not considering whether Aper's testimony, the methods he used, and the evidence to which he testified were, in fact, unreliable. We offer no opinion on whether a conviction based on a seven-loci match is sustainable. Further, we express absolutely no opinion about the accuracy of the aforementioned database studies or whether convictions in other cases were properly upheld on the partial-profile matches. Although the dissent faults us for not commenting on the merits of the sources, the admissibility of the scientific evidence here is not at issue. Rather, we assess simply the competency of counsel's performance. The fact that other cases have upheld convictions based on fewer-loci matches (where, as noted, there was also significant corroborating evidence of guilt), or that the methods have been found reliable, is irrelevant. Here, reliability is simply divorced from advocacy.

¶ 31    It is critical to note that, contrary to the dissent's characterization of our decision, we do not find counsel's performance deficient simply because she failed to use the referenced academic writings, nor do we set knowledge of obscure academic articles as the baseline requirement for effective representation. Rather, we consider whether counsel, in her role as

---

[5]For this argument, the State relies on the following out-of-state and/or unpublished authority: *Jackson v. Commonwealth,* 587 S.E.2d 532 (Va. 2003) (DNA matched six of eight loci *and* the defendant's detailed confession was corroborated by the victim's injuries); *Williams v. State*, No. M2007-02328-CCA-R3-PC, 2009 WL 29884 (Tenn. Crim. App. Jan. 6, 2009) (unpublished) (five-loci match *and* the victim identified the defendant); *State v. Hicks*, No. 27939-8-II, 2003 WL 734232 (Wash. Ct. App. Mar. 4, 2003) (unpublished) (five of nine loci matched *and* physical evidence, such as the victim's keys and knife used in the crime, were tied to the defendant); *Compton v. Hartley*, No. 07-CV-02363-WYD, 2009 WL 3052290 (D. Colo. Sept. 22, 2009) (unpublished) (not reciting facts presented at trial, but noting that Colorado tests only 7, not 13, genetic loci, and a match is defined as being where all 7 loci are exactly the same).

-10-

defendant's advocate and with her "overarching duty" to use her skills and knowledge to render the trial a reliable adversarial process, subjected the evidence against defendant to the type of inquiry to which a reasonably effective defense attorney, confronted with the circumstances of defendant's trial, would subject it. In our view, there is no question that, in any routine presentation of DNA evidence, a reasonably effective defense attorney confronted with the circumstances of defendant's trial would, in some capacity, argue that a DNA comparison based on fewer than 13 loci might be unreliable or that the partial profile recovered might not be uncommon. While the existence of the aforementioned studies and commentary (which, we note, pertained to matches at nine loci, not only seven as presented here) are examples of resources that could be referenced to formulate those arguments, our assessment of counsel's performance is not tied to any particular academic source or compilation of sources. Indeed, the well-established fact that the police routinely test DNA evidence at 13 loci is the only information needed to make a basic argument that the fewer loci available for testing the less certain the results might be. Further, the fact that, as the dissent points out, there is a statutory procedure by which an attorney may request a database search for the recovered DNA profile (725 ILCS 5/116-5(a) (West 2006)) reflects that attorneys need not act as, to use the dissent's words, "omniscient academics" in order to know that questioning the statistical implications of a recovered DNA profile is a basic line of inquiry. *Infra* ¶ 76. We conclude that it was objectively unreasonable for counsel to refrain from pursuing, *in any regard*, a challenge to the *significance*, if any, of the alleged seven-loci match presented.

¶ 32    When we view in its entirety the manner in which defense counsel handled the DNA issue in this case, it is clear that counsel's challenge to this evidence was virtually nonexistent, and quite possibly counsel simply did not understand the evidence. Again (and unlike the cases upon which the State relies to argue that convictions may be upheld on partial-profile matches), the *only* evidence linking defendant to this crime (the seven-loci comparison) was uncorroborated and unchallenged. Counsel's cross-examination of the only witness linking defendant to the crime consisted of three questions. We do not mean to suggest that the *number* of questions asked rendered the performance *per se* unreasonable. Indeed, we acknowledge that, generally speaking, whether to call particular witnesses and the manner and extent of cross-examination are matters of trial strategy that will not ordinarily support an ineffective-assistance-of-counsel claim. *People v. Ramey*, 152 Ill. 2d 41, 54 (1992). However, as an ineffective-assistance claim requires consideration of how a reasonably effective defense attorney would conduct himself or herself if confronted with the circumstances of the defendant's trial, the question of what constitutes sound trial strategy is necessarily fact-dependent. *Fletcher*, 335 Ill. App. 3d at 453. The presumption that counsel's actions or omissions were the product of sound trial strategy may be rebutted when the chosen strategy is "so unsound that counsel *completely fails to conduct any meaningful adversarial testing*." (Emphasis added.) *People v. Leeper*, 317 Ill. App. 3d 475, 482 (2000). Here, there was only one piece of evidence linking defendant to the crime, and the circumstances required subjecting that evidence to adversarial testing beyond that displayed. As such, we conclude that counsel's performance fell below an objective standard of reasonableness.

¶ 33    Turning to the *Strickland* prejudice prong, we conclude for similar reasons that there is a reasonable probability, *i.e.*, a probability sufficient to undermine confidence in the outcome, that, but for counsel's deficient performance, the outcome of the trial would have been different. *Strickland*, 466 U.S. at 687. "DNA evidence is often assumed to have a special aura of certainty and mystic infallibility ***." Joel D. Lieberman *et al.*, *Gold Versus Platinum: Do Jurors Recognize the Superiority of DNA Evidence Compared to Other Types of Forensic Evidence?*, 14 Psychol. Pub. Pol'y & L. 27, 52 (2008). Here, there was a basis to challenge the infallibility of the DNA evidence against defendant, which was portrayed as a "match," but that argument and evidence was not developed. Given that the DNA evidence here was the *only* evidence against defendant, there is a reasonable probability that, if counsel had effectively explained and argued to the jury the potential weaknesses of the evidence, reasonable doubt as to defendant's guilt might have been raised.

¶ 34    We note that we disagree with the State that defense counsel cured any prejudice in closing argument. Aper testified only that defendant could *not be excluded* as contributing to the profile obtained from the hairs on the window. In closing, however, the State emphasized that Aper found a "match," and although defense counsel in her closing accurately recounted Aper's finding, she nevertheless proceeded to refer to the "match" at seven points and say that "over half the DNA match is what we have."[6] Further, counsel's inaccurate summary of Aper's statistics–stating that one-third of the population would have defendant's DNA profile–suggests a lack of understanding of the evidence. Thus, while the defense closing argument made clear that there was no other evidence for the jury to consider, it did not erase the prejudice created by the failure to subject that remaining evidence to adversarial testing.

¶ 35    Moreover, we disagree with the State and the dissent that there is no prejudice because defendant admitted his guilt at the sentencing hearing where, in his statement in allocution, he apologized to those he had harmed, indicated that he understood why the State was asking for the maximum sentence, stated that he could not justify his actions, and commented that any punishment he received would be less than what he deserved. It is clear that, to constitute a judicial confession, the statement must *directly* acknowledge guilt or *directly* and *necessarily* imply guilt. Compare *People v. Green*, 17 Ill. 2d 35, 39, 41 (1959) (finding a judicial confession where the defendant's in-court statement was " 'Well, I will tell the truth, your Honor. You see, I committed the crime.' "), with *People v. Redd*, 173 Ill. 2d 1, 29-30 (1996) (finding that the State improperly characterized as a confession the defendant's statement to a witness, wherein he asked who "killed the kids" (suggesting knowledge of the killings that others lacked), because the defendant did not therein "directly acknowledge his commission of the offenses"), and *People v. Hunter*, 331 Ill. App. 3d 1017, 1025-26 (2002)

---

[6]We note that we simply cannot abide by the dissent's suggestion that a layperson on a jury, who has received absolutely no guidance from defense counsel about a nonexclusion and whether that is, in fact, different from a match is able to parse out the potentially nuanced distinction on his or her own. As such, we disagree with the dissent's suggestion that counsel's representation was effective when she told the jury that defendant's profile was a seven-loci "match" to that from the hairs.

(the defendant, convicted of forgery, stated at sentencing that his "purpose" in going to the currency exchange was to " 'obtain more currency for more crack cocaine' "; court disagreed that stating the purpose for going to the exchange was sufficient to constitute a judicial confession that the defendant was the person who forged the check). Here, defendant's statement, which intermittently discussed prior crimes, his faith, and accepting responsibility for those he had harmed, was simply too vague to be considered a confession. Instead, while defendant's statements *may* be read to suggest guilt, they may also be read as referring to his remorse for a life of crime generally, and not specifically to this offense, in an attempt to obtain the most lenient sentence possible.

¶ 36    We further disagree with the dissent's position that defendant's examination of witnesses at his posttrial motion hearing meets the standard of a judicial confession. "A judicial confession is a voluntary acknowledgment of guilt during a judicial proceeding, *such as a plea of guilty, testimony at trial, or testimony at some other hearing*." (Emphasis added.) *Hunter*, 331 Ill. App. 3d at 1025; see also *Green*, 17 Ill. 2d at 41-42 ("a judicial confession consists of a plea of guilty to an indictment or some similar action or conduct in a court or judicial proceeding. [Citations.] The testimony of an accused at the trial may constitute a judicial confession, [citation] or such confession may consist of a statement before a magistrate on preliminary [hearing]."). At the posttrial motion hearing, defendant offered no guilty plea or personal testimony, and his questions of witnesses and introduction of evidence are not akin to a guilty plea or his own testimony. Rather, as his motion alleged ineffective assistance of counsel, defendant's presentation at the hearing was designed to establish that he and his counsel had disagreed about trial strategy, namely, whether defendant should take the stand, confess to the crime, and tell the jury that, because God forgives him, the jury should enter a not-guilty verdict. Counsel advised against that strategy, and defendant challenged that advice at the hearing. Therefore, defendant's examination of witnesses and presentation of exhibits reflected that defendant, at one point in pretrial strategy discussions with his attorney, suggested making a judicial confession but did *not* ultimately do so. We view this evidence as similar to other testimony, at the same hearing, reflecting that defendant had engaged in guilty-plea discussions with the State. The fact that defendant entertained pleading guilty does not equate to a guilty plea. Similarly, evidence that defendant discussed with counsel confessing to the crime in court does not equate to a judicial confession. We conclude, therefore, that *Strickland*'s prejudice prong is satisfied and that there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different.

¶ 37    Accordingly, we reverse defendant's conviction and remand the cause for a new trial with new counsel. Moreover, because we are remanding for a new trial, we must consider whether the evidence was sufficient to prove defendant's guilt beyond a reasonable doubt. *People v. Fornear*, 176 Ill. 2d 523, 535 (1997). Here, defendant makes no argument regarding the sufficiency of the evidence, and we conclude that, if the evidence presented is accepted by the jury, it would support a finding of guilt. Thus, there is no double jeopardy impediment to a new trial. *Fornear*, 176 Ill. 2d at 535.

¶ 38                    B. Ineffective Assistance–Posttrial Counsel

¶ 39    Defendant next argues that posttrial counsel provided ineffective assistance where he did not file a postsentencing motion. However, as we are reversing defendant's conviction and remanding for a new trial, we need not address this argument.

¶ 40                            III. CONCLUSION

¶ 41    For the foregoing reasons, the judgment of the circuit court of Winnebago County is reversed, and the cause is remanded.

¶ 42    Reversed and remanded.

¶ 43    JUSTICE BIRKETT, dissenting:

¶ 44    I respectfully dissent. First, I disagree that trial counsel's challenge to the strength of the State's DNA evidence fell below professional norms because counsel failed to conduct a more thorough cross-examination of the State's expert or retain a defense expert to challenge the theoretical basis for the State's DNA analysis. Second, I agree with the State that, even if counsel's performance was deficient, defendant suffered no prejudice, because he made confessions during his sentencing. Though the State does not recognize it, defendant also made confessions during the hearing on his *pro se* motion for a new trial.

¶ 45              I. Trial Counsel's Performance Was Not Deficient

¶ 46    First, I stress just how high a burden defendant faces attacking trial counsel's performance. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. "[T]he defendant must prove that counsel made errors so serious, and that counsel's performance was so deficient, that counsel was not functioning as the 'counsel' guaranteed by the sixth amendment." *People v. Richardson*, 189 Ill. 2d 401, 411 (2000). "[C]ounsel's strategic decisions are virtually unchallengeable" (*People v. Palmer*, 162 Ill. 2d 465, 476 (1994)); "matters of trial strategy will not support a claim of ineffective assistance of counsel unless counsel failed to conduct any meaningful adversarial testing" (*People v. Patterson*, 217 Ill. 2d 407, 441 (2005)). Given the sketchy record on the ineffectiveness claim, perhaps the principle most important here is that a "strong presumption" exists that "trial counsel had good reasons for strategic decisions." *United States v. Lindsey*, 157 F.3d 532, 535 (7th Cir. 1998).

¶ 47    I divide my analysis of trial counsel's performance into two sections. The first section addresses counsel's performance at trial. The second section examines counsel's overall representation in the case, as counsel's performance at trial was but one component of the conduct that *Strickland* requires us to examine. "The issue of incompetency of counsel is always to be determined from the totality of counsel's conduct." *People v. Mitchell*, 105 Ill. 2d 1, 15 (1984); see also *Montgomery v. Peterson*, 846 F.2d 407, 412 (7th Cir. 1988)

("Counsel's performance must be evaluated in view of the totality of the circumstances ***." (citing *Strickland*, 466 U.S. at 689)). As I explain in greater detail below, the record reflects that counsel engaged in the sound pretrial strategy of pursuing plea negotiations with the aim of minimizing the substantial prison time to which defendant was exposed given the multiple pending charges he was facing in addition to the residential burglary charge in this case. Those six additional charges included three charges of residential burglary, one charge of possession of a stolen vehicle, one charge of theft, and one charge of criminal trespass to land. In aggravation at sentencing, the State produced compelling evidence of defendant's involvement in two specific residential burglaries, which, though it is unclear, may have been among the cases pending during the proceedings below. Counsel secured a reasonable offer of 25 to 30 years in prison, which was in the lower half of the range of prison time (12 to 60 years) that defendant would have faced if convicted of the current offense and of one or more additional residential burglaries if committed while he was on bail for the current offense. Defendant, however, rejected the offer, was tried, and then was sentenced to the maximum of 30 years on the one burglary count alone. Trial court records, of which this court may take judicial notice (see *In re Estate of Pellico*, 394 Ill. App. 3d 1052, 1059 (2009) (taking notice of circuit court records)), show that all other pending charges were dismissed on December 6, 2010. Viewed in its totality, counsel's conduct was prudent and reasonable, since defendant was spared from the much harsher sentence that he would have received if convicted on the remaining pending charges.

¶ 48                          A. Counsel's Conduct at Trial

¶ 49    My initial complaint is that the majority's conclusions are not based on the record, as there virtually is no record on the specific issues that defendant raises on appeal. In defendant's *pro se* posttrial motion, the allegation of ineffectiveness for counsel's handling of the DNA issue consisted of just these few lines in paragraph 10:

"10. Under the line of defense [that] counsel chose for the defendant his rights to adequate representation and a meaningful adversarial defense were violated to [*sic*] a fair trial in the said ways:

(1) By both failing and neglecting to question and challenge the [State[']s witness concerning evidence and reports. [Citation.]"

At the evidentiary hearing on his posttrial motion, at which defendant also appeared *pro se*, defendant questioned trial counsel on her handling of the DNA issue:

"Q. How come you never called anybody on behalf of the defense to question your line of reasoning as far as the Buccal swab testings or hair testing, as to counter the defense–or the State's evidence?

A. Well, the technician that did the testing testified, and I cross-examined that person.

Q. Effectively?

A. I believe so.

Q. Do you recall the questions you asked?

A. Specifically, no.

Q. Do you recall questioning—how many witnesses you questioned during the trial?

A. No. I know that there were witnesses that I asked no questions of. Those were simply witnesses that testified that there had been a burglary. And I was pretty clear there had been a burglary. The question was whether or not you had committed it. So the main focus was on the DNA testimony.

Q. Okay. Your line—your line of defense was?

A. Simply that they could not prove the case beyond a reasonable doubt, based on the evidence that they had.

Q. Okay. And you never called into question any other person to dispute the evidence?

A. Did I call witnesses?

Q. Correct.

A. No.

* * *

Q. As far as the State making comments in reference to statistical data in trial, in closing arguments, your line of defense was that evidence could be—couldn't exclude anybody related to me, correct?

A. That was one argument, yes.

* * *

Q. So as far as [the State] making reference to statistical data that was contrary to your line of defense, why didn't you object?

* * *

THE COURT: *** The question is, was there anything that was being argued that was a misstatement of the evidence by either side. The question is, did you feel there was any misstatement made by opposing counsel of the evidence?

A. Not that I specifically recall. If there was—I mean I guess I just don't remember.

Q. So you don't recall her closing argument?

A. Generally I recall. I don't—I don't remember any specific misleading."

¶ 50 Following the testimony, the parties argued the merits of paragraph 10 of the posttrial motion, and the trial court made its ruling:

"THE COURT: [Paragraph 10.]

[Defendant]: Under the line of defense counsel chose for the defendant his rights to a meaningful, adversary defense were violated and a fair trial in said ways. And I stipulated six different ways, and I went over them during questioning, as far as my attorney. And they're pretty clear-cut, as far as how they're written down.

THE COURT: Do you wish to respond?

MS. LOMBARDO [Assistant State's Attorney]: Judge, I guess I would just note that they are all very vague. There is nothing specific about his allegations, so I don't know how they are sufficient for the Court to make a ruling with regards to what specifically

that [*sic*] he is alleging she failed to do. Other than that, I would just stand on the testimony that's been presented here at trial. And I do believe that [trial counsel] did not commit any errors.

THE COURT: I will deny paragraph 10 in its entirety."

¶ 51    As the State noted, defendant's allegation of ineffectiveness in paragraph 10 remained "vague" even after the testimony and argument. The only evidence pertinent to paragraph 10 that defendant elicited at the evidentiary hearing was trial counsel's testimony that her "focus" at trial was the DNA testimony, that she believed that her cross-examination of Aper was "effective[ ]," that she called no witnesses for the defense, and that she made no objection to any part of the State's closing argument and could not recall anything "misleading" in that argument. In arguing paragraph 10 of his motion, defendant essentially stood on the testimony. "Under the standards laid out in *Strickland*, the defendant must point to a specific act or omission of counsel which he alleges shows prejudice or unprofessional error." *People v. Collins*, 153 Ill. 2d 130, 140 (1992) (citing *Strickland*, 466 U.S. at 690). The trial court properly denied the ineffectiveness claim, as defendant specified no way in which trial counsel (as he alleged) "fail[ed] and neglect[ed] to question and challenge the [State[']s witness concerning evidence and reports." See *Collins*, 153 Ill. 2d at 140 (defendants' postconviction claims of ineffectiveness of trial counsel failed under *Strickland* as defendants did not "refer to specific actions or arguments the trial counsel should have made"); *People v. Williams*, 139 Ill. 2d 1, 17 (1990) (in case where ineffectiveness was alleged for the first time on appeal, it was inadequate for defendant to assert simply that "trial counsel 'entirely failed to subject the prosecution's case to meaningful adversarial testing' and that 'trial counsel *** objected not often enough,' objecting 'a grand total of six times' "). Trial counsel acknowledged that she called no witnesses for the defense, but defendant did not articulate how any such witnesses could have helped the defense.

¶ 52    Given defendant's failure to develop his vague assertions, I cannot agree with the majority's description: "[D]efendant *** challenged counsel's lack of cross-examination of the State's DNA expert, her failure to present any evidence to challenge the DNA evidence, and the overall ineffectiveness of her efforts regarding that evidence." *Supra* ¶ 21. This is, in my view, an unwarranted expansion of defendant's bald claim that trial counsel "fail[ed] and neglect[ed] to question and challenge the [State[']s witness concerning evidence and reports." Defendant never identified in what specific way trial counsel's efforts fell short. His thin posttrial efforts cannot reasonably be called (as the majority terms it) a "challenge," much less a "challenge" to any specific act or omission by trial counsel.

¶ 53    Appellate counsel for defendant now attempts to revivify the ineffectiveness claim. The attempt is limited by the sparse record developed below, because "[a] court of review must determine the issues before it solely on the basis of the record made in the trial court" (*People v. Reimolds*, 92 Ill. 2d 101, 106-07 (1982)). The majority, however, allows appellate counsel to expand the ineffectiveness claim into a shape unrecognizable from the form it had below. The vague, undeveloped allegations have ballooned into a focused attack on trial counsel. The majority agrees that trial counsel's performance fell below professional standards and highlights three main omissions by trial counsel in her challenge to the DNA evidence. First, counsel failed to exploit Aper's acknowledgment that, with respect to one

of the seven loci, he could not positively say that defendant was a "match" (to use the majority's term). Second, counsel failed to "press Aper or present evidence regarding the theoretical possibility that, if defendant's DNA profile were found to match the hair DNA at seven loci, but to *not* match at any of the six missing loci, defendant likely would be *excluded* as the source of the crime-scene DNA." (Emphases in original.) *Supra* ¶ 26. In support, the majority cites the work of "one legal scholar," David Kaye, who, according to appellate counsel, has "explained that matching at fewer than 13 loci will *exclude* a suspect if it can be determined that there is no match at the remaining available loci." (Emphasis in original.) *Supra* ¶ 26. Third, counsel neglected to use recent literature in which "legal scholars and mathematicians *** doubt the alleged low probability of encountering a random, partial-profile 'match' in the general population." *Supra* ¶ 27. Below, I explain the relationship among these conclusions and address them on their merits. For now, I note a fundamental procedural problem with the majority's course of action.

¶ 54    Regarding its third point, the majority has in mind specifically the studies of offender databases in Arizona, California, and Maryland, as well as the opinions of scholars challenging the soundness of statistical probabilities generated by the product rule. The majority has mined this literature and data from the withdrawn *Wright* opinion.[7] The *Wright* court, however, at least took pains to note which extrajudicial information cited by the parties on appeal was actually before the trial court when it ruled on the defendant's motion for a pretrial database search. See *Wright*, slip op. at 32 ("Although the trial court in the case at bar was not presented with the results of the Maryland or Illinois searches, the trial court did have in front of it information from the search of the Arizona database, which revealed 120 pairs of 9-loci 'matches' in a database of 65,493 offenders."). The majority here is not so cautious, but accepts appellate counsel's offering of multiple scholarly sources, none of which was even mentioned in the posttrial proceedings on defendant's ineffectiveness claim.

¶ 55    I cannot endorse this approach. Though the State (oddly) does not complain that appellate counsel is improperly enlarging the ineffectiveness claim, this court has, nonetheless, a responsibility to retain its role as an error-correcting tribunal acting within the bounds of the trial record. The problem of ineffectiveness claims springing up for the first time on appeal and lacking a properly developed record is not a new one. Our appellate court has repeatedly noted the severe limitations the defense faces when it attempts to allege ineffectiveness based on a silent record–as was essentially done here given that the claim at hand was practically undeveloped in the trial court. See *People v. Ligon*, 365 Ill. App. 3d 109, 122 (2006) ("Where the disposition of a defendant's ineffective assistance of counsel claim requires consideration of matters beyond the record on direct appeal, it is more appropriate that the defendant's contentions be addressed in a proceeding for postconviction relief, and the appellate court may properly decline to adjudicate the defendant's claim in his direct appeal from his criminal conviction." (Internal quotation marks omitted.)); see also *In re Ch. W.*, 399 Ill. App. 3d 825, 829 (2010) ("One of the problems with raising an ineffective-assistance claim on direct appeal is [that] 'appellate counsel and the court must proceed on a trial record

---

[7]As the majority recognizes, we granted the State's motion to strike *Wright*.

not developed precisely for the object of litigating or preserving the claim and thus often incomplete or inadequate for this purpose.' " (quoting *Massaro v. United States*, 538 U.S. 500, 504-05 (2003))). More to the point, we should not allow a party to contrive an issue for appeal by simply citing us scholarly sources. See *Hernandez v. State*, 116 S.W.3d 26, 31-32 (Tex. Crim. App. 2003) (prosecution could not offer, for the first time on appeal, scientific literature endorsing the "ADx analyzer" as a reliable test for the presence of drugs in urine; the prosecution "cannot now rely on the appellate courts to become independent scientific sleuths to ferret out the appropriate scientific materials which could support the trial court's decision to allow the ADx technician's testimony. *** [J]udicial notice on appeal cannot serve as the sole source of support for a bare trial court record concerning scientific reliability.").

¶ 56    I recognize that, in *People v. Dalcollo*, 282 Ill. App. 3d 944, 955 (1996), one of the earliest cases in Illinois to consider the admissibility of statistical probabilities generated by the product rule,[8] this district held that, where a reviewing court is facing "the question of the general acceptance of a new scientific theory or technique," the court need not "determine the issues on appeal based solely on the trial court record," but may "consider the expert evidence presented in the trial court, judicial opinions from other jurisdictions, and any pertinent legal and scientific commentaries."

¶ 57    *Dalcollo*'s approach does not transfer to the present situation. This court is not facing the question of the general admissibility of particular scientific evidence, where it is arguable that a reviewing court needs to draw on all pertinent resources before crafting a broad pronouncement on admissibility. The question is the competency of counsel's performance under the law as it existed in August 2009, and counsel could not have been expected to advocate for, or anticipate, any change in the admissibility of DNA evidence. (In fact, it is doubtful that an ineffectiveness claim, strictly construed, could ever be a vehicle for changing the underlying law.) The majority would appear to agree given its comment that the issue at hand "concerns *advocacy*, not admissibility" (emphasis in original) (*supra* ¶ 30) and given its refusal to take any stance on the ultimate merit of the scholarly opinions it cites, which are critical of the product rule, the methodology that Aper utilized. The only scholarly opinion the majority cites regarding the statistical probabilities generated by the product rule comes in the form of snippets that Daniel Kaye quotes from mathematician Keith Devlin. Devlin, however, uses rather harsh language in denouncing the very admission of statistical evidence based on the product rule:

> "When a defendant's DNA matches that from a crime-scene, it is standard practice to introduce the probability of a random match in the general population. *** [I]t is easy to be skeptical of such extreme claims. Keith Devlin, a mathematician at Stanford University, calls them 'total nonsense' and a 'damned lie.' In Devlin's view, it is 'disgraceful' that courts allow experts to provide such small random-match probabilities:

---

[8]*Dalcollo* was decided roughly two weeks after, yet (strangely) did not cite, *Miller*, 173 Ill. 2d at 189, in which the supreme court embraced "the product rule [as] a generally accepted statistical method for estimating the frequency of a DNA match."

'They may as well admit alchemy and astrology.' [Citations.]" Kaye, *supra*, at 147-48.

¶ 58 The majority believes that trial counsel did not have to advocate for abolition of the product rule to be an effective counselor, but, strangely, the only opinion the majority identifies as an example of the strategy that counsel should have adopted condemns the product rule in the most strident terms. The majority gives no indication of how trial counsel was supposed to use Devlin's opinion, much less how counsel was supposed to use it short of challenging, as Devlin does, the basic reliability of the product rule. In my view, *Dalcollo* definitely does not apply here, yet I am not convinced that the majority is itself treating this question as one of advocacy rather than admissibility.

¶ 59 Even if it were proper for this court to accept these scholarly sources cited for the first time on appeal, the ineffectiveness claim would still fail because there is no record as to why trial counsel did not pursue cross-examination or introduce evidence based on those opinions. If appellate counsel is allowed to rely on those opinions in order to criticize trial counsel, who, if only the matter had been raised below, might have given legitimate reasons for not utilizing this information, appellate counsel will be bypassing the proof process and ambushing on appeal not only trial counsel, whose reputation is at stake, but also the State, which now must defend trial counsel's actions by simply conjecturing as to why counsel acted as she did. An ineffectiveness claim cannot proceed in this way, as case law shows.

¶ 60 In *Ligon*, the defendant alleged, for the first time on appeal, two instances of ineffective assistance of counsel. First, the defendant alleged that trial counsel was ineffective for failing to interview a certain witness, Compton, prior to trial. Second, the defendant alleged that counsel violated canons of professional ethics by claiming, without justification, that Compton would testify at trial. *Ligon*, 365 Ill. App. 3d at 121-23. The appellate court declined to adjudicate the issues because they had not been raised below and no record was developed as to why trial counsel acted as they did:

"[The issue of trial counsel's failure to interview Compton prior to trial] was not specifically raised in defendant's posttrial motion and no evidence pertaining to this particular contention was elicited during the hearing on the motion. For instance, the court did not hear evidence that Compton was, in fact, available to be interviewed prior to the commencement of trial. Consequently, we cannot determine from the record whether defense counsel's decision not to interview Compton until trial had commenced was a matter of necessity, because Compton was unavailable or some other extenuating circumstance existed, a matter of trial strategy or simply a result of incompetence.

\*\*\*

\*\*\* [As to trial counsel's representation that Compton would testify, the] [d]efendant did not raise this particular contention in his posttrial motion. At the hearing, Compton testified that he did not speak to defense counsel until the day of trial. Defense counsel testified that he had spoken with Ligon several times prior to trial and that he specifically had spoken to defendant about Compton. Nonetheless, defense counsel was not asked about his reasons for his opening statement that Compton would testify. Accordingly, it is impossible for us, at this juncture, to determine whether, despite the fact that he had not yet interviewed Compton, trial counsel had some other reasonable basis to believe

-20-

that Compton would testify." *Id.* at 122-23.

The court rejected the ineffectiveness claims, noting that a postconviction proceeding was the proper avenue for bringing them. *Id.*; see also *Busby v. State*, 990 S.W.2d 263, 268-70 (Tex. Crim. App. 1999) ("A defendant must overcome the strong presumption that an attorney's actions were sound trial strategy," and "[o]rdinarily, that presumption cannot be overcome absent evidence in the record of the attorney's reasons for his conduct."); *People v. Mendoza Tello*, 933 P.2d 1134, 1135 (Cal. 1997) ("[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim on appeal must be rejected" (internal quotation marks omitted)); *Robertson v. State*, 319 N.E.2d 833, 836 (Ind. 1974) ("the trial attorney's reasons for his decisions remain unexplained," and "[w]ithout evidence to the contrary, we presume there were legitimate reasons for the tactical decisions which are at issue on this appeal").

¶ 61    The majority does not attempt to distinguish *Ligon* but cites two cases, *People v. Phillips*, 383 Ill. App. 3d 521 (2008), and *People v. Foster*, 168 Ill. 2d 465 (1995), which, it claims, recognize that "[a] defendant may raise an ineffectiveness-assistance claim on direct appeal when the basis of the claim may be ascertained from the record." *Supra* ¶ 21. Neither case helps the majority. The analysis in *Phillips* simply did not necessitate the kind of inquiry that is crucial to the ineffectiveness claim here. The defendant in *Phillips*, who was tried and convicted of first-degree murder and aggravated arson, argued that his trial counsel was ineffective for failing to request an instruction on criminal damage to property as a lesser included offense of aggravated arson. Because, however, the appellate court determined that the evidence would not have rationally supported an acquittal of aggravated arson and a conviction of criminal damage to property, the court never reached the issue of whether trial counsel had a strategic reason for failing to request the instruction. That issue would have posed a substantial obstacle for the defendant, as "*irrespective of whether an offense is considered a lesser-included offense*, Illinois courts have generally recognized that '[t]he decision to offer an instruction on a lesser-included offense is one of trial strategy, which has no bearing on the competency of counsel.' " (Emphasis added.) (Internal quotation marks omitted.) *Phillips*, 383 Ill. App. 3d at 540. Similarly here, even if it is assumed (as I deny below) that the theories expounded in the scholarly sources might have helped defendant's case, there was no record developed as to why trial counsel did not take that approach. Lacking the relevant context, we simply cannot conclude that counsel's performance was deficient.

¶ 62    As for *Foster*, the majority states in its parenthetical description that the supreme court was able to judge the defendant's ineffectiveness allegations "regarding an attorney's *failures* to perform" (emphasis in original) (*supra* ¶ 21). The issue, however, is not whether an ineffectiveness allegation concerns an omission as opposed to a commission, but whether there is a suitable record upon which to judge counsel's conduct. In *Foster*, the defendant was convicted of first-degree murder and sentenced to death because he killed the victim during the course of an aggravated criminal sexual assault. The defendant alleged that his trial counsel was ineffective during the trial because "he failed to: (1) present an opening statement; (2) develop a cohesive theory of defense; (3) present the defense of involuntary

-21-

intoxication; (4) defend the aggravated criminal sexual assault aspect of the prosecution; and (5) address the felony murder issue during closing argument." *Foster*, 168 Ill. 2d at 480. The defendant also alleged that trial counsel "erred when he conceded in closing argument that defendant 'killed the woman he loved.' " *Id.* The court addressed and rejected these in turn. The court was able, based on the record of counsel's actions at trial, to infer why counsel acted or failed to act as he did. For instance, with respect to counsel's failure to make an opening statement, the court said:

> "[T]wo of the three witnesses whom the defense planned to call were unavailable to testify at trial. The third defense witness refused to testify based on his fifth amendment right against self-incrimination. Further, since the defendant did not testify, the defense presented no evidence. Under the circumstances, defense counsel's decision to waive opening statement was not unreasonable." *Id.* at 482-83.

By contrast, the record here sheds no light on why trial counsel failed to utilize the academic theories that appellate counsel cites. Therefore, under *Ligon*, defendant's claims must be brought, if at all, in a collateral challenge.

¶ 63    Because the ineffectiveness claim, as it was framed below, did not include an allegation that trial counsel was incompetent for failing to frame a defense along the lines of the scholarly sources that appellate counsel cites, no record was developed as to why trial counsel did not assume that strategy. *Strickland* claims are not to be judged in the abstract and relief granted simply because a different course of action might have served the defendant better. Nor is a *Strickland* claim necessarily proven even if it is apparent that another attorney in the same situation would have acted differently. See *People v. Rodriguez*, 364 Ill. App. 3d 304, 312 (2006) ("For purposes of *Strickland*'s first prong, it is not enough that another lawyer, with the benefit of hindsight, would have acted differently than trial counsel."). While I think it is probably misguided, in any circumstances, to pluck academic theories from obscurity and hold a defense attorney responsible for not having framed a defense around them, it is certainly improper to reach such a conclusion without a record as to why the attorney did not take that course of action. A "strong presumption" exists that "trial counsel had good reasons for strategic decisions." *Lindsey*, 157 F.3d at 546. Defendant did not overcome the presumption of competency, because he did not develop the ineffectiveness claim in the court below.

¶ 64    I acknowledge, of course, that the sparsity of the record may well have been due to defendant's choice to represent himself during posttrial proceedings. Also, the State has not argued that the record is insufficient for our review of the ineffectiveness claim. Regardless, we cannot responsibly find trial counsel ineffective based on this record.

¶ 65    Even if I assumed that the record is adequate, I could not reach the same conclusions as the majority. Of course, to assume that the record is adequate, I have to make an assumption as to why trial counsel did not take the course of action the majority envisions. The record is completely silent on this point, and I am forced, like the majority, to operate in a vacuum. Though I maintain that it is improper to consider these scholarly sources without any inkling as to why trial counsel did not herself consider them, I note that the majority further errs in its interpretation of those sources. Notably, in order to conclude that counsel was ineffective,

the majority had to find these sources so compelling that counsel, in failing to utilize them, could not have been "functioning as the 'counsel' guaranteed by the sixth amendment." *Richardson*, 189 Ill. 2d at 411. I believe this is a drastic and, ultimately, unjustifiable position.

¶ 66 My first concern relates to the majority's methodology, as it appears to have reached its conclusion after taking a relatively narrow sample of academic writings on the issue of DNA. The majority evidently considered only those sources cited in *Wright*, the principal authority on which appellate counsel relies. I find this curious. Since the majority has already allowed the ineffectiveness issue to take a shape far different from what it had in the lower court (and what the record permits), I cannot imagine why the majority would feel an institutional constraint to consider only *Wright*'s own sources. I believe that the majority, having opened the door to scrutiny of trial counsel's performance in light of academic writings, should have felt free to survey the field, and, I propose, it was the majority's intellectual duty to conduct a wider survey before reaching such a harsh conclusion about trial counsel's performance. Just how wide a survey would have been appropriate is difficult to say, but then such is the conundrum that courts face once they detach themselves from the trial record and begin to roam for extrajudicial sources: where and when does the review stop? Though it is in the nature of academics to disagree, and indeed the product rule has been (and probably still is) debated in the literature, the majority acknowledges no academic opinions contrary to those of Devlin. I say "acknowledges" rather than "cites" because the majority has cited Kaye, who, as it happens, does not share Devlin's hostility toward the product rule. I am not sure, however, that the majority realizes where Kaye stands on the issue. After noting the results of the Arizona database study, the majority makes this remark in which it quotes from Kaye:

> "These findings prompted commentary that, if the frequency 'for a nine-locus match is anything like one in 754 million for whites, and one in 561 million for blacks [as some DNA experts testify], how can it be that a database as small as [Arizona's with] a mere 65,493 entries produces even one such match?' Kaye, *supra*, at 155." *Supra* ¶ 28.

¶ 67 Though the majority does not quote further, Kaye proceeds to answer the question, and he defends the product rule against the heated criticisms from Devlin. Immediately following the remark quoted by the majority, Kaye writes:

> " 'Scary isn't it?' asked Devlin.
>
> B. The Combinatorial Explosion: All-pairs Trawls and the Birthday Problem
>
> This scenario is only scary if we conflate the size of the database with the number of comparisons being made to find a match. ***
>
> \* \* \*
>
> *** [I]n a trawl through all possible pairs in a database, every profile in the database is compared with every other profile. *** [T]he database need not be so huge before one can expect many matches that have very small random-match probabilities. One-to-one comparisons (the testing of a known suspect) and one-to-n searches (for a cold hit) are markedly different from large n-to-n comparisons (the all-pairs trawls), although commentary confusing the latter two types of searches is all too common.
>
> All-pairs trawling–an artificial form of searching that is not used in criminal

-23-

investigations–is analogous to the famous 'birthday problem.' The problem is to determine the minimum number of people in a room such that the odds favor there being at least two of them who were born on the same day of the same month. ***

*** [A] precise calculation shows that it takes only 23 people before it is more likely than not that at least two people in the room share a birthday. The actual number is this small because the matching birthday can be any one of the 365 days in the year and because the number of comparisons among birthday scales as $n^2$ with an increasing number of n people in the room.

Thus, all-pairs trawling in databases makes it much less surprising to come across partial (or even full) matches among unrelated people than in ordinary casework. Just think about how many distinct pairs can be formed, and then compared, with the 'mere 65,493 entries' in the Arizona database. *** If the chance of any nine-locus match for any pair were 'one in 754 million,'[9] then the expected number of nine-locus matches would be not just one. It would not even be 90 *** or *** 122 ***. It would be $(1.53 \times 10^{12})/(7.54 \times 10^8) = 2,304$ nine-locus matches. It seems as if random-match probabilities are even smaller than the theoretical estimates." Kaye, *supra*, at 155-57.

Kaye adds this qualifier:

"But that conclusion cannot rest on these particular numbers. The theoretical random-match probability is not 1 in 754 million. That estimate pertained to Caucasians with the genotype seen in the first nine-locus match back in 2001. Each profile has its own random-match probability in each population group. A detailed study would need more than the summary statistics to ascertain whether the observed numbers of partial matches exceed those predicted by the basic product rule for unrelated individuals. To account for the vast number of possible pairings, we could refer to the individual profiles to compute the different RMP [random match probabilities] for each pair of profiles and derive an expected number of partial matches. Or, we could use a more efficient procedure that merely requires the number of loci at which all the pairs match and the number of loci at which they partially match. In principle, more detailed studies with individual-level data on profiles and relatedness (or suitably detailed counts) might suggest that the theoretical RMPs are just fine, are too high (benefitting defendants), or are too low." *Id.* at 158.

¶ 68    Kaye then addresses the objection that existing offender databases are inadequate for research because they are not a purely random sampling of the population:

"The choice, however, is not between ideal research databases and worthless, motley assemblies of samples. The allele-frequency databases are themselves convenience samples with less-than-perfect group classifications, but they still have a place in producing reasonable estimates of allele frequencies and in verifying the assumptions of statistical independence. Likewise, the offender databases could play a role in checking on basic product-rule (and more sophisticated) calculations of random-match

---

[9]This was, at least as of 2001, the reported probability of a nine-loci match among Caucasians.

probabilities.

*It is therefore worth describing the studies that already have been conducted. As a whole, they do not cast much doubt on the entrenched methods for estimating match probabilities.* However, the existing research is limited in scope, and further research could reinforce or undermine this conclusion." (Emphasis added.) *Id.* at 160.

¶ 69   Kaye then describes several studies of the Arizona database that were conducted to address the number of matching pairs:

"Using the basic product rule with an estimated uniform single-locus match frequency of about 1 in 14, Charles Brenner reported that the excess number of nine-locus partial matches could be explained by a very small degree of dependence. A more detailed, but also unpublished, analysis by Steven Myers reached the same conclusion. Myers employed the affinal model for a structured population and considered some values for the proportion of full siblings in the Arizona database. Bruce Weir also found no excess in the observed number of partial matches in Arizona. A more complex study by Laurence Mueller used simulations with varying numbers of subpopulations, degrees of population structure, and proportions of siblings and parent-child pairs in the Arizona database. By adjusting these parameters, he was able to fit the numbers of observed nine-locus partial matches or ten-locus partial matches with his model–but not both at the same time. To put it another way, all his simulations were consistent with 150 nine-locus matches and 15 ten-locus ones. The actual numbers of nine-locus and ten-locus matches in the Arizona database, it will be recalled, were 122 and 20, respectively. Thus, there were 20% fewer nine-locus matches and 25% more ten-locus matches than a theoretical model with product-rule RMPs would predict. *These discrepancies may be statistically significant, but they present a very different picture than the original portrayal of inexplicably 'huge' numbers of partial matches in Arizona. The studies of the few numbers reported in Arizona do not demonstrate that the theoretical computations yield absurdly small estimates of the true probabilities of a match among unrelated individuals.*" (Emphasis added.) *Id.* at 161-62.

¶ 70   After reciting the findings of other studies, Kaye concludes that "the research to date gives little reason to doubt the adequacy of [existing models] for computing multilocus STR frequencies." *Id.* at 164.

¶ 71   I have included such large extracts for two reasons. First, I want to show that, whatever the majority intended to imply in citing Kaye, he himself is not one of the "legal scholars" who have come "to doubt the alleged low probability of encountering a random, partial-profile 'match' in the general population." *Supra* ¶ 27. At least, such a characterization needs qualification. As for the remaining "scholars," the majority leaves them anonymous. Devlin is quoted by Kaye, but the majority does not explain the basis of Devlin's criticism. This leaves, then, the database studies themselves, but their import is not self-evident, and the extracts from Kaye quoted above demonstrate that the significance of those matches is open to debate. Nonetheless, the majority suggests that these studies could have been used by trial counsel to suggest that "Aper's figures, given that they were based on only a partial-profile comparison, might be inaccurate." *Supra* ¶ 28. Since the majority cites no basis for believing

that those database studies undercut statistical conclusions like Aper's (Kaye himself is mostly supportive of the product rule), it has shown absolutely no cause for going to such an extreme as to conclude that trial counsel's failure to incorporate the database studies into a line of defense amounted to a fundamental failure to subject the State's case to adversarial testing. In order to reach such a harsh conclusion, the majority would have to treat Aper as essentially a flat-earther whose opinions desperately needed correction by clearly established science that would be patently obvious to trial counsel. Yet no source cited by the majority supports this perspective.

¶ 72 My second purpose in quoting at length from Kaye was to demonstrate the highly technical nature of his topic. If it was difficult to navigate these passages, imagine digesting the entire 25 pages of text and footnotes and then moving on to supplemental reading such as the sources that Kaye cites, any sources that cite him, and any other relevant sources on the topic. This rings of the work of an academic, but it is also the work, as the majority conceives it, of an Illinois defense attorney preparing for trial in an Illinois prosecution where inculpatory DNA evidence is anticipated. Actually, there is the threshold issue of how trial counsel would have run across Kaye's article in the first instance, since *Wright* had not been decided in August 2009 when defendant was tried. I have not found one published case, in any jurisdiction, citing Kaye's article. Trial counsel would have had to find this obscure article outside judicial sources, along with whatever other works (in whatever fields of study) the majority believes would have completed counsel's research.

¶ 73 This expectation is simply unreasonable. Certainly, trial counsel was expected to know what manner of DNA evidence Illinois courts permitted as of the August 2009 trial. At that time, the supreme court's decision in *Miller*, which recognized the reliability of the product rule for determining the statistical significance of a DNA match (*Miller*, 173 Ill. 2d at 189) was still the law in Illinois (and remains so today). Certainly, trial counsel was expected also to know how to mitigate the impact of statistics derived according to the product rule. Counsel did so by eliciting Aper's acknowledgment that his population set did not account for relatives of defendant and that, while an identical twin would match at all 13 loci, a relative could match at fewer than 13 loci. The majority essentially dismisses the import of this inquiry, but, ironically, the majority seems out of alignment here with the very literature it has set up as the standard of competency. See Kaye, *supra*, at 158 n.75 ("The family relationships of the individuals whose profiles are in a database are potentially important. Assuming that everyone is unrelated can result in underestimates of the expected numbers of matches. More partial matches would be likely because close relatives will match more often than will the unrelated individuals to whom the theoretical RMPs apply.").

¶ 74 In my view, counsel could not be expected to press a line of defense that questioned the basic assumptions of the product rule. Those assumptions had been questioned in the 1990s, but the debate was dwindling by 1996 when this court decided *Dalcollo*. In that decision, we sketched the history of the controversy:

"[T]he debate centered on the possibility of subgrouping among populations. ***

Riding the crest of this alleged 'bitter debate' [citation], some courts have rejected testimony on probability statistics on the ground that the calculations were not generally

-26-

accepted in the scientific community. [Citations.] Other courts, including some in Illinois, have remanded the case for further consideration on whether the ceiling principle, a conservative method of estimating probabilities that attempts to account for population subgrouping, is generally accepted. [Citations.]

We need not decide whether these cases were properly decided. Even if the foregoing publications ignited a 'bitter debate' in the scientific community, and thus demonstrated that the calculation of probability statistics was not generally accepted in the scientific community, the debate has clearly calmed in the last several years. This calming is attributable to two developments not considered by the foregoing cases.

The first is the recognition by scientists that more conservative methods to calculate statistical probabilities do not create a corresponding reduction in random match probability calculations. The NRC Report recommended that scientists use the ceiling principle, as opposed to the product rule, to calculate statistical probabilities. However, Eric Lander, an early critic of the use of probability statistics, as well as a coauthor of the NRC Report, and Bruce Budowle, one of the principal architects of the FBI's DNA program, have observed that the use of this more conservative method does not create a corresponding reduction in random match probability calculations. [Citation.]

The second development is the FBI's completion of an exhaustive worldwide population survey, a survey which was recommended by the NRC Report. [Citation.] The study rebutted the assumption that population subgrouping affected DNA probability estimates to a defendant's disadvantage. [Citation.] *** Based on these findings, the study concluded that the estimate of the likelihood of occurrence of a DNA profile derived by the current practice of employing the product rule and using general population databases is reliable, valid, and meaningful, without forensically significant consequences. [Citation.]" *Dalcollo*, 282 Ill. App. 3d at 959-60.

¶ 75 We concluded that the debate, at least in extrajudicial circles, over the product rule had died down. *Id.* at 960. In *Miller*, decided the same month in 1996 as *Dalcollo*, the supreme court also noted that the controversy over the product rule was "dissipating" and that the concerns about subgroups were not "borne out by empirical studies." *Miller*, 173 Ill. 2d at 188-89.

¶ 76 The academic debate over the product rule was material to the decisions in *Dalcollo* and *Miller*, as those courts were deciding the general gatekeeping question of whether statistics derived from the product rule were reliable enough for admission in Illinois courts. Now that *Miller* has been decided, trial courts need not conduct *Frye* hearings revisiting the reliability of the product rule. See *People v. Hickey*, 178 Ill. 2d 256, 279 (1997) (upholding, based on *Miller*, the trial court's denial of a *Frye* hearing on the product rule); see also *People v. Basler*, 193 Ill. 2d 545, 551 (2000) ("Where *** a scientific method has been shown to be generally accepted, a *Frye* test is no longer necessary each time the State seeks to use evidence obtained by that method."). The majority stresses that what it expected from trial counsel was simply more vigorous advocacy, not an assault on the product rule itself. As I have noted, however, the only scholarly opinion that the majority cites as a guide for how trial counsel should have conducted a defense is that of Devlin, who likens the statistical

-27-

derivations of the product rule to prescientific tripe. The majority specifies no more moderate approach for counsel to have taken. *Strickland* does not require counsel to anticipate future developments in the law (*People v. Ford*, 228 Ill. App. 3d 212, 216 (1992)), much less to advocate for them. Competent counsel under *Strickland* must be conversant in Illinois criminal law but need not range the scholarly literature for cutting-edge developments that might favor the defendant if incorporated into Illinois law. The journals and law reviews are crammed with theories by which any given attorney's performance might be questioned. The majority would have practitioners be academics, and omniscient academics at that. I believe that the majority is taking far too much advantage of hindsight. *Strickland* cautions us that it is "all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689.

¶ 77   The majority also does not propose how trial counsel was to make use of the literature critical of the product rule. Likewise, appellate counsel, though criticizing trial counsel for "fail[ing] to present evidence to the jury" as to what "experts have said," does not propose how such evidence would have cleared the general hearsay bar against admission of treatises and journals as substantive evidence (*Jackson v. Reid*, 402 Ill. App. 3d 215, 235-36 (2010)). Counsel could have cross-examined Aper on the data and opinions in the literature, but only by first establishing the author(s) as reliable authority. *Darling v. Charleston Community Memorial Hospital*, 33 Ill. 2d 326, 336 (1965). Even then, however, the data and opinions would be "admi[ssible] as impeachment but not as substantive evidence." *Walski v. Tiesenga*, 72 Ill. 2d 249, 258 (1978). The majority cautions that its holding is not that trial counsel should have "introduced those specific sources into evidence," but that the sources "reflect[ ] merely the existence of various arguments that counsel could have used." *Supra* ¶ 21 n.2. Later, however, the majority remarks that the cited literature "could be referenced to *formulate* *** arguments." (Emphasis added.) *Supra* ¶ 31. Thus, the majority equivocates on whether it would have been possible for trial counsel to make such arguments at trial without incorporating opinions and data from the literature and, hence, encountering the very evidentiary hurdles I have noted. For instance, how was trial counsel to reference the database studies? The majority is silent on the issue.

¶ 78   Appellate counsel also argues that trial counsel should have presented her own expert to testify "that the statistical calculation that the State relied on was seriously flawed." The majority claims that there was "viable *** evidence" (*supra* ¶ 25) that trial counsel could have produced, but does not expressly fault trial counsel for failing to present an expert (and indeed does not even address this aspect of appellate counsel's ineffectiveness claim). Since, however, appellate counsel has not identified an expert who was available to give the testimony that appellate counsel describes, this aspect of the ineffectiveness claim fails for lack of development. See *People v. Todd*, 178 Ill. 2d 297, 330 (1997) ("defendant has not shown whether any expert was available" who could have given the testimony defendant claims trial counsel should have presented); *People v. Bauer*, 393 Ill. App. 3d 414, 424 (2009) ("even if the defendant's theory provided a valid defense for her actions, we note that the defendant presented no evidence that such an expert in fact existed who would testify in

support of her theory. Indeed, appellate counsel, when representing the defendant on her posttrial motion, did not submit an offer of proof as to how an expert would have testified on her behalf. As this court will not speculate as to whether such an expert could have been found, we will not find trial counsel ineffective on this basis.").

¶ 79    Today's decision has far-reaching consequences given that this case involved an entirely routine presentation of DNA evidence. There is no credible way to distinguish this case from the hundreds that are tried in Illinois each year and involve the admission of DNA evidence. Though there are "countless ways to provide effective assistance in any given case" (*Strickland*, 466 U.S. at 689), I fear that the clear signal of the majority's decision is that defense counsel in every DNA case henceforth must tailor its approach to the scholarly sources the majority cites. Thus, the majority, I believe, has not heeded *Strickland*'s admonition that "intrusive post-trial inquiry into attorney performance *or of detailed guidelines for its evaluation* would encourage the proliferation of ineffectiveness challenges." (Emphasis added.) *Id.* at 690.

¶ 80    Notably, the majority does not challenge my assertion that Kaye simply does not hold the opinions that the majority implies he holds. Nor does the majority contest my assertion that, aside from Devlin's outright dismissal of the product rule (his reasons for which the majority does not develop), the majority has failed to cite any scholarly opinion that undercuts the product rule. Instead, the majority cautions that its "assessment of counsel's performance is not tied to any particular academic source or compilation of sources" and that the cited literature comprises simply "examples of resources that could be referenced to formulate *** arguments." *Supra* ¶ 31. The majority suggests that the literature merely confirms a line of defense that should have been obvious to trial counsel. Hence, according to the majority, "there is no question" that a reasonably competent attorney faced with inculpatory DNA evidence would argue "that a DNA comparison based on fewer than 13 loci might be unreliable or that the partial profile recovered might not be uncommon." *Supra* ¶ 31. To the extent that the majority is suggesting here that trial counsel should have challenged Aper's statistical derivations, I note that the majority specifies no way in which counsel could have done so short of challenging the presuppositions of the product rule and thus raising an issue of admissibility that surely would have been rejected by the trial court with a simple citation to *Miller*. It was certainly not from the post-*Miller* case law that counsel could have learned how to make such a challenge. Rather, it was from the "obscure academic articles" that, despite what the majority says, have now become the "baseline requirement for effective representation" in DNA cases (*supra* ¶ 31).

¶ 81    I recognize that the majority has criticisms of trial counsel's performance besides her failure to challenge Aper on the soundness of the statistics he offered. First, the majority makes reference to "one legal scholar [who] has *explained* that matching at fewer than 13 loci will *exclude* a suspect if it can be determined that there is no match at the remaining available loci." (Emphases added and in original.) *Supra* ¶ 26. The scholar is Kaye, and the majority goes on to quote a passage from his article. In what follows I highlight that passage and provide its context:

> "The commotion began after staff from the Arizona Department of Public Safety's DNA laboratory posted an announcement of 'A Nine STR Locus Match Between Two

Apparently Unrelated Individuals' at an annual scientific meeting on DNA identification methods in Phoenix in 2001. It is not clear from published accounts how this nine-locus match–between a white and a black man with felony convictions–was discovered. The database records consisted of a list of the alleles at thirteen distinct loci. *When the same thirteen loci can be typed in a crime-scene sample, a mere nine-locus match will not generate a suspect. In fact, the discrepancies in the full profile at the other four loci will exclude a suspect as a possible source of crime-scene DNA.* But even partial matches at nine loci are almost never encountered in case work. Indeed, according to one report, the RMP for the matching nine-locus genotype in Arizona was '1 in 754 million in Caucasians, 1 in 561 billion in African Americans, and 1 in 113 trillion in Southwest Hispanics.' The discovery of such a match in the state database surely seemed anomalous." (Emphasis added.) Kaye, *supra*, at 153-54.

¶ 82    I do not see how the majority can view the highlighted material as an "explanation" when Kaye offers no substantiation for his assertions. Though it is simply on faith that the majority gives the assertions credence, Kaye's brief *vitae* in his article does not suggest the credentials of a DNA expert. As the State demonstrates through its citation to multiple cases upholding convictions based on less than a "mere nine-locus match," courts of law appear not to have taken Kaye's view as to the kind of match that is probative of guilt. The majority, however, does not regard these cases as simply inconclusive on the issue, but goes so far as to call them "irrelevant." *Supra* ¶ 30. The majority, I think, has no ground for crediting the unsupported word of a legal scholar while outright dismissing the holdings of courts throughout our country.

¶ 83    I also do not see the pertinence here of Kaye's remark that "the *discrepancies in the full profile at the other four loci* will exclude a suspect as a possible source of crime-scene DNA." (Emphasis added.) Kaye, *supra*, at 153-54. By "discrepancies," Kaye means variances in information between the loci mapped from the suspect's sample and the loci mapped from the crime-scene sample. Aper's testimony makes clear, however, that there can be no variance or "discrepancy" where there is no information at a particular locus; the suspect is neither included nor excluded on the basis of that absence. (For instance, Aper said of one locus: "Since there is no information in my crime scene profile at this location, no comparisons really happen here.") Aper testified that the sample from the window yielded information at only 7 of 13 loci. As the majority acknowledges, Aper was equivocal about whether there was a correspondence at the seventh locus. Aper said:

"This D13 [seventh] location I have a type 10, and he has a 1013. So he's got some. This is one type that's consistent with this profile, but I did not observe the 13 there. But the problem is when we get low level DNA samples, sometimes we have information below, let's say, our threshold for analysis. *** So this information was strong enough for me that I could not exclude him as a contributor because it's possible that a 13 is at this location, but it's below our threshold."

What is clear, however, is that there was no variance or "discrepancy" at the remaining six loci mapped from the crime-scene sample, because Aper was not able to get information on them. Thus, it is not clear what use trial counsel could have made of Kaye's assertion about a *full* 13-loci map of the crime-scene DNA where there is information at each locus.

Although the majority acknowledges that trial counsel stressed for the jury that there was no information at several loci, the majority holds that counsel should also have "develop[ed] for the jury that the missing loci could be critical and, in fact, exculpatory." *Supra* ¶ 26. This would have been needless speculation. The most critical fact that the jury needed to know about the missing loci was that they were neutral as to defendant's guilt. This fact was fully conveyed through Aper's testimony.

¶ 84    The majority also finds two affirmative missteps in trial counsel's closing argument. First, the majority notes that counsel remarked that Aper found a "match" at seven loci when Aper (as the majority puts it) "concluded only that defendant could not be excluded as a contributor, *not* that defendant *was a match*" (emphases in original). *Supra* ¶ 26. The majority assumes that there is a difference between a nonexclusion and a "match," and that the latter is more incriminating, but the record does not bear this out. Aper never used the word "match" or "nonmatch" to refer to the results of his comparison,[10] and the majority cites no other source from which the jury might have ascertained a difference between a nonexclusion and a "match." In its own closing argument, the State remarked that Aper found that the crime-scene sample "match[ed]" defendant, but the State did not elaborate on the meaning of the term. The majority claims that I am wrongly attributing to the jury an ability to "parse out the potentially nuanced distinction" between a nonexclusion and a match. *Supra* ¶ 34 n.6. My point is that the evidence at trial gave the jury no reason to distinguish between the two concepts. Likewise, the record gives the majority no reason to distinguish between the two. The majority, rather, appears to be utilizing its own personal concept of "match," which, I believe, is not an appropriate source.

¶ 85    Second, the majority notes that trial counsel misstated the evidence by inferring from Aper's testimony that (in counsel's words) "a third of the general population would have similar DNA typings that were found from the window." This indeed was a misinterpretation of Aper's testimony, but "[t]he issue of ineffective assistance of counsel is to be determined from the totality of counsel's conduct, not from isolated incidents" (*People v. Spann*, 332 Ill. App. 3d 425, 430 (2002)). On the whole, trial counsel's advocacy was aggressive and sound. She moved for a directed verdict, stressing not just that the State had only DNA evidence that defendant committed the crime, but also that the quantity of DNA recovered from the window did not meet the crime lab's preferred minimum level:

"The only evidence is the one swabbing or the swabbing from the window. And the DNA expert testified that although [defendant] could not be excluded, the standard that he received was below the minimum threshold that they usually require. I believe it was three nanograms. For those reasons, I am *** requesting a directed verdict."

¶ 86    In closing argument, trial counsel stressed in greater detail what was lacking in the State's case. After noting that there was no direct evidence of defendant's guilt, counsel argued that the circumstantial evidence was inadequate. Specifically, counsel noted that the police found none of the stolen property in defendant's possession and that there was no footprint or fingerprint evidence linking defendant to the scene. Regarding the DNA

---

[10]He did, at one point, refer to the comparison process itself as "match[ing]."

evidence, counsel did not repeat her point, which she made in arguing for a directed verdict, that the quantity of the samples did not meet the crime lab's preferred minimum amount, but she did highlight other weaknesses in the DNA evidence. First, she made the insightful observation that though, according to Aper, DNA is more likely to be shed the more tightly one handles an object, Aper excluded defendant as the source of the DNA on the screwdriver, the perpetrator's apparent means of forcing entry. Counsel may well have believed, soundly, that an attack on Aper's methodology would be risky because it might ultimately call into doubt his exculpatory conclusions about the screwdriver.

¶ 87        Second, counsel noted that Aper could not derive information from all 13 loci, but found a "match" at only 7 of 13 loci. Finally, counsel recalled Aper's acknowledgment that, in generating his statistical probabilities, he did not account for defendant's relatives, whose DNA profiles could correspond with his at some of the 13 loci. To my mind this was, to use the majority's phrase, "a basic argument that the fewer loci available for testing the less certain the results might be." *Supra* ¶ 31.

¶ 88        Finally, I note that Assistant Public Defender Ed Light testified that trial counsel discussed her trial strategy with him and that he did not "disagree" with it. A defense attorney's seeking of advice from fellow professionals suggests care and diligence that are relevant to the *Strickland* inquiry. See, *e.g.*, *Boykins-White v. State*, 701 S.E.2d 221, 226 (Ga. App. 2010). "A defendant is entitled to reasonable, not perfect, representation ***." *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). Trial counsel clearly met this threshold.

¶ 89        I conclude that neither appellate counsel nor the majority has identified any realistic way by which trial counsel, either through additional cross-examination of Aper or introduction of expert testimony, could have more vigorously challenged the DNA evidence in this case. I note that there was one avenue available to trial counsel that neither appellate counsel nor the majority recognizes. Since appellate counsel and the majority stake so much of their claims on the discoveries of matching pairs in state DNA databases, I am surprised that they have not considered whether trial counsel should have sought a court order directing the State Police to search the Illinois database for the profile that Aper generated from the DNA matter recovered from the window. See 725 ILCS 5/116-5(a) (West 2006) ("Upon motion by a defendant charged with any offense where DNA evidence may be material to the defense investigation or relevant at trial, a court may order a DNA database search by the Department of State Police."). Possibly, this option never occurred to appellate counsel or the majority only because the issue was never raised during the posttrial proceedings on the ineffectiveness claim. Neither, however, does much of the current ineffectiveness claim have a basis in the record. I think it is no less arbitrary and artificial to speculate as to why trial counsel did not use the scholarly opinions and data that defendant cites for the first time on appeal than it is to conjecture as to why trial counsel did not request a database search. (Though if I had to guess, trial counsel might not have asked for a search because she was fearful that defendant would be the only match.) The record on both issues is nonexistent.

¶ 90                          B. Counsel's Conduct Before Trial

¶ 91                                  1. Introduction

¶ 92    Trial counsel's representation at trial was competent, but a full and fair *Strickland* inquiry requires us to examine the totality of her representation. "The issue of incompetency of counsel is always to be determined from the totality of counsel's conduct." *Mitchell*, 105 Ill. 2d at 15; see also *Montgomery*, 846 F.2d at 412 ("Counsel's performance must be evaluated in view of the totality of the circumstances ***." (citing *Strickland*, 466 U.S. at 689)).

¶ 93    The first point to consider, in this wider look at counsel's conduct, was the number and nature of the charges defendant faced.

¶ 94    In addition to the felony charged in this case, defendant faced five other felony charges and one misdemeanor charge:

| | Arrest | Case No. | Charge |
|---|---|---|---|
| (this case) | 8/15/07 | 08 CF 1692 | residential burglary |
| | 6/4/08 | 08 CF 2112 | residential burglary |
| | 8/27/08 | 08 CF 4410 | residential burglary |
| | 8/27/08 | 08 CF 4411 | possession of a stolen motor vehicle |
| | 9/19/09 | 08 CF 3722 | residential burglary |
| | 9/19/08 | 08 CM 7289 | criminal trespass to land |
| | 10/16/08 | 08 CF 4658 | theft |

¶ 95    At least one of the residential burglaries was committed on or about September 16, 2008, while defendant was on bail for this case. If convicted of both the current offense and the September 16, 2008, residential burglary, defendant faced potential extended terms/consecutive sentences of 12 to 60 years in the Illinois Department of Corrections. 730 ILCS 5/5-8-2(a)(3) (West 2006). Given the number and the seriousness of the charges facing defendant, trial counsel began to pursue plea discussions with the State.

¶ 96    Defense counsel's appropriate pursuit of plea negotiations is a factor in judging counsel's performance under the *Strickland* standard. *People v. Palmer*, 162 Ill. 2d 465, 477-78 (1994). "[T]he concept of plea bargaining and its attendant benefits for both parties has been recognized as a necessary element of criminal justice administration." *Id.* at 477. Not only is plea bargaining permitted under *Strickland*, there is a constitutional duty to plea bargain "where the facts and circumstances of the offense and its proof, as well as an assessment of available factual and legal defenses, would lead a reasonably competent counsel to believe that there is a reasonable possibility of a result favorable to the accused through the process of plea negotiations." *Id.*

¶ 97    The evidence in aggravation at sentencing shows that the State had compelling evidence against defendant as to two residential burglaries aside from the current offense. (It is unclear from the record whether these burglaries were charged while the present case was pending below.) First, Detective Eric Swenson testified that, in the course of investigating a May 14, 2007, burglary at 2611 Harlem Boulevard in Rockford, he received from the State crime lab a report noting that DNA had been recovered from the window by which the perpetrator

-33-

apparently gained entry and that a search of the DNA database revealed a match to defendant's profile.

¶ 98 Second, Detective James Gallagher testified that, between September 13 and 16, 2008, a series of burglaries were reported in the Parker Woods subdivision in Rockford. One of the reported burglaries occurred at 532 Euclid Avenue on September 16, 2008. Among the items reportedly taken from 532 Euclid Avenue were food, jewelry, and a flat-panel television. Gallagher testified that the officers who first responded to the Euclid Avenue burglary recovered a flat-panel television in the woods across the street. On September 17, 2008, Gallagher went to the area for further investigation. He spotted defendant, who matched the description of a suspect who was seen in the area. Gallagher spoke to defendant, who said that he was staying at the Traveler Motel. When Gallagher arrived at the motel about an hour later, the manager confirmed that defendant had been staying there but left that night after depositing a white garbage bag in a trash bin. Gallagher recovered the bag and showed its contents to the residents of 532 Euclid, who identified the food, collector coins, and jewelry inside the bag as the items that were taken from their home. The motel manager gave Gallagher a possible address where defendant and his girlfriend, Sherry Swewait, might be found. Gallagher went to the address and spoke with defendant and Swewait. Gallagher testified about his conversation with defendant:

"I asked him about the the [*sic*] jewelry and the items recovered [from 532 Euclid], and he said he didn't know nothing about them; then I spoke to him, told him I was aware that there were a couple other cases that I knew there was some DNA recovered, and he was listed as a suspect in, and he made a comment to me that there's no reason you should talk to me because of the other two cases because he may be spending most of his life or the rest of his life in prison when he goes to trial on the cases."

¶ 99 Gallagher then spoke to Swewait, who reported that defendant "had come back with some coin pouches" and mentioned a television that was hidden in the woods. Swewait mentioned to Gallagher that defendant had been selling stolen items to "Nate." Gallagher went to the address that Swewait gave for "Nate" and there spoke to a Nate Hoper, who said that, on the night of September 16, 2008, defendant came to Hoper and said that he had a television he wanted to sell to Hoper and that it was hidden in the woods. Defendant took Hoper to a wooded area near 532 Euclid but no television was there.

¶ 100 As there was compelling evidence against defendant on these two burglaries, trial counsel was right to seek a plea bargain that encompassed both the current offense and the other pending cases. The pretrial record, as well as the evidence adduced during posttrial proceedings, demonstrates the following: (1) trial counsel secured a favorable offer, namely, a prison term (25 to 30 years) in the lower half of the range (12 to 60 years) that defendant would face if convicted of the current offense and of one or more additional residential burglaries if committed while he was on bail for the current offense; (2) defendant ultimately rejected the offer, foreclosing all further bargaining; (3) defendant told counsel that he planned to take the stand, confess to the crime, and ask the jury for forgiveness; (4) defendant vacillated on this plan, but finally abandoned it only after the State rested its case on the day of trial; (5) defendant was convicted and sentenced to 30 years–in the lower half of the range of prison time that defendant likely would have been facing ultimately; and (6) the remaining

pending charges were dismissed. When considered in view of the sentence that defendant might have received if the remaining charges were not dismissed and he was convicted of one or more additional residential burglaries (which was likely given the evidence against him), counsel's performance was, overall, reasonably effective.

¶ 101                              2. Further Background

¶ 102    I set forth the relevant background. These facts are relevant both to this discussion and the discussion, in Part II below, of the *Strickland* prejudice prong.

¶ 103    On January 22, 2009, the parties reported to the court that there were "some negotiations on this case" as well as some outstanding discovery that the State would be furnishing. The case was continued to February 4, 2009, at which time the parties requested a "30-day date for a possible plea." By agreement of the parties, on February 18, 2009, the trial court entered an order releasing defendant into the custody of Swenson and Gallagher on February 18 and 19, 2009, "for purposes of investigation." On March 4, 2009, trial counsel reported to the court that the parties "had anticipated having a plea agreement" but that defendant wanted "to set the–the case for a trial." Trial counsel informed the court that, because of the potential sentence facing defendant, his decision was "over her advice." The State then withdrew its offer.

¶ 104    At no time prior to trial did trial counsel reveal to the court any confidential communications she had with defendant or any of the discussions she had with the State. The case proceeded to trial, and defendant was found guilty on August 11, 2009. Trial counsel filed a motion for a new trial and, later, an amended motion for a new trial. However, defendant filed a motion to proceed *pro se*, accusing trial counsel of ineffective assistance, and then adopted trial counsel's motion, which was eventually superseded by defendant's amended *pro se* motion for a new trial.

¶ 105    Paragraphs 8 and 9 of the motion alleged the following:

"8. The defendant's rights were violated under the 6th Amendment to effective counsel when [trial counsel] questioned defendant's fitness to stand trial and failed to have defendant evaluated.

9. The defendant's rights were violated when a conflict of interest arose when defendant [*sic*] desire to testify on his own behalf because of religious beliefs interfered with [trial counsel's] desire for defendant not to testify. [Trial counsel] advised defendant he did not have a defense in which now defendant claims violated his 1st Amendment rights of religion and freedom of speech. And under 775 ILCS 35/10(1) and Article 1 section 3 of the Constitution of the State of Illinois. (*People v. Daniels*, 230 Ill. App. 3d 527, 535)."

¶ 106    On October 1, 2009, the trial court conducted an inquiry of defendant regarding his ability to represent himself. Defendant expressed a desire to discharge trial counsel and proceed *pro se* despite the trial court's offer to appoint new counsel. The court found that defendant had the capacity to represent himself and had sufficient knowledge.

¶ 107    Defendant requested discovery in preparation for his posttrial motion hearing. At the

October 15, 2009, status hearing, the State tendered its discovery in the case. Also on October 15, defendant requested "all reports, records, and documents in the Public Defender's Office concerning [him] and [his] case." Defendant also requested "any kind of written things that [trial counsel] may have written down *** [r]egarding when [she] came up and interviewed [him]." Defendant explained that he needed trial counsel's notes to "help [his] case in proving ineffective assistance of counsel." Defendant also remarked that he "may have to call a couple of other public defenders as witnesses." The court granted defendant's request. The following exchange then took place:

"[TRIAL COUNSEL]: Even though I'm not on Mr. Watson's case on that case, I do think that [defendant] needs to be advised that if that's what he's requesting, those notes need to be turned over to the State. They'll see details of conversations that were had between us.

THE COURT: Mr. Watson.

DEFENDANT: Well, could I review them first? I'm the–

THE COURT: Counsel.

[TRIAL COUNSEL]: Judge, I'll do whatever the court requests. I'm just–I just wanted to make sure that Mr. Watson was advised of that.

THE COURT: Uh-huh. Yeah, I mean, if you're going to be utilizing notes from your attorney to support your claim that you received ineffective assistance of counsel, the State's Attorney has a right to see those notes. That would mean that you would literally be waiving your right to the confidentiality of those notes. Those notes are confidential between you and your attorney, but now that you've claimed that they're ineffective in assisting you in the counsel, and you're going to use those notes–

DEFENDANT: They could be helpful.

THE COURT: Then the State's Attorney is entitled to see them."

Arrangements were made for defendant to review the notes before allowing the State to see them.

¶ 108    On October 22, 2009, another status hearing was held in preparation for the hearing on defendant's posttrial motion. Defendant told the court that he needed to subpoena Assistant Public Defenders Light and Frank Perri, and also possibly Gallagher and Swenson. When the court asked defendant why he needed the detectives, defendant answered that it "concern[ed] a negotiated plea." Trial counsel then explained to the court that, at one time, there was an agreement that involved defendant clearing cases, and he did clear cases but later changed his mind about the plea. The court remarked that it did not see in defendant's posttrial motion "any attempt to enforce a plea negotiation that [defendant] believe[d] was not kept." Defendant then commented that he needed time to amend his motion.

¶ 109    On December 3, 2009, the trial court conducted a hearing on defendant's posttrial motion. Defendant called several witnesses: trial counsel, Perri and Light, and Swenson.

¶ 110    Perri testified that, on the day of trial, he was asked by trial counsel to meet with her and defendant to discuss whether defendant should testify. Perri testified concerning that meeting:

"Q. Can you clarify exactly what [trial counsel] wanted you to observe when she brought you into the bullpen to speak to me?

A. Basically what I recall was whether or not you should or should not testify. There was no indication on your part whether you wanted to or didn't want to. We were looking at your options and looking at the options of whether you should or should not testify, any risks that you would be exposing yourself to in testifying. There was never any indication that she forced you not to testify, if that's what you're indicating.

Q. No, I'm not saying that at all. I'm just trying to establish that we were at odds whether I should take the stand or not. I mean can you verify that?

A. And I'm saying that it's my recollection of the conversation was [*sic*] you were simply looking at all the options, whether you should testify and how that might play itself out at trial, and if you didn't testify, how that might play itself out at trial. And we wanted to make sure that you understand how different scenarios could play themselves out at trial.

Q. And it was clear at that time that I wanted to take the stand.

A. And again, there was no conclusion reached by you whether you did not want to. We were simply discussing the different options and that at the end of the day that it was your decision whether you wanted to testify or not. And we made sure that you understood that.

Q. So both of you agreed that I should not have took [*sic*] the stand?

A. No. Again, we laid out the risks, the cost/benefit of testifying, and we indicated it was up to you whether you wanted to testify or not.

Q. Do you recall what it was that I was wanting to take the stand for?

A. What I recall you [*sic*] indicating that, something to the effect that because Jesus forgave you, that the jury would forgive you, too."

¶ 111    Light testified that, on March 16, 2009, he and trial counsel met with defendant. Trial counsel wanted her and Light to speak with defendant together regarding his reasons for "not going with the [State's] offer." According to Light, trial counsel and defendant were "180 degrees" apart on how to defend the case. The three of them discussed defendant's proposed testimony, which, Light recalled, had "a religious component to it," but Light could not remember any further details. Light also could not remember if trial counsel and defendant disagreed over whether he should testify. To refresh Light's recollection, defendant produced defense exhibit 3, trial counsel's notes of her conversations with defendant. The notes read as follows:

"3/16 <u>Jail Visit</u>

–D. wants to testify that he was there, but it was the 'sin w/in me' that did the crime- explained to him not a defense and not in his best interest to testify.

–Later meet w/dave. Per Dave - not enough for fitness, I have to let D testify if he wants to.

–Later met D in jail w/Ed

-37-

–See other notes

–been forgiven by God

   –so can't plea guilty

–diff. btwn flesh + spirit (E[11]–not judging spirit)

–Law of man does not apply to me (I've been forgiven [illegible])

   –spiritual laws/grace system

   –not judgment system

–I've been called to a higher purpose

   (Jury has limited role–did you do it?)

–The sin w/in me committed the crime

   E: body execeted [*sic*] whatever the sin did

   –judge not competent to judge you spiritually

   –spiritually irrelevant–not going to let in at trial

–Wasn't me but sin that dwelled w/in me

–E: ever consider possibility that you could be wrong? (Talk to pastor/or chaplain)
***

–God uses least likely people to show prophesies

–Want truth to be known

   –E: God has sense of right v. wrong

   –why god on your side in this instance

–God says consequences paid for by Jesus going to the cross

–Mans [*sic*] law applies to–DNK: Can not speak as to what God would say

   –E: maybe your [*sic*] being selective and only hearing what you want to hear

–E: What you want to say is not admissible

   –Issue is factual not spiritual

–[Illegible] truth = God has forgiven me

–[Illegible] hope = Jury same forgiveness

–Can convict my flesh–cannot convict my spirit."

¶ 112    Light testified that defense exhibit 3 refreshed his recollection that "[defendant] wanted to testify, and [trial counsel] cautioned against it, which I would have agreed with." Light observed that the notes also reflect that defendant was told that his proposed defense would not be "lawful." Light denied, however, that either he or trial counsel told defendant that he could not testify. Finally, Light recalled that he and trial counsel discussed defendant's fitness to stand trial, but that the discussion did not take place in defendant's presence. Light noted that, after observing defendant at the March 16, 2009, meeting, he had no doubt that

---

[11]Presumably, "E" designates Ed Light.

defendant was fit.

¶ 113    Swenson testified that, as he recalled, there had been an agreement between the defense and the State. The agreement was that defendant "would cooperate and participate in a drive around and clear up all the cases that [he was] involved in in exchange for [his] guilty plea on two residential burglaries and the sentence of 25 to 30 years."

¶ 114    Lastly, defendant called trial counsel. The trial court admonished defendant that, by calling trial counsel as a witness, he was waiving his attorney-client privilege. Defendant acknowledged the admonishment and elected to proceed with the examination. Counsel affirmed that, at one point in her representation of defendant, they were "at odds" over how to proceed with the defense. Defendant wanted trial counsel "to present certain evidence that [she] did not think was in [his] best interests to present." Specifically, defendant wanted "to get up on the stand and confess." He wanted trial counsel "to argue to the jury that [defendant] had committed this crime; however, [defendant] had been forgiven by God, and therefore the jury should forgive [him] as well and find [him] not guilty." Defendant then showed trial counsel defense exhibit 3 in an effort to refresh her recollection as to whether he discussed with her "another line of defense." After reviewing the exhibit, trial counsel recalled that defendant had claimed that "it was the sin that compelled [him]" and that counsel did not "know how that went into [defendant's] line of defense." Counsel recalled that, since she had never had a client who wanted to confess on the stand, she spoke with her supervisors. Counsel brought Light to one of her meetings with defendant because she wanted "someone else just to come up and talk with [him] and explain, someone who was more experienced." Counsel thought that defendant "would be more receptive to an older male." On another occasion, counsel brought Perri with her

> "to be a prover in case something like this happened, because you had changed your mind–before trial had started and the months leading up to trial you had changed your mind from wanting to testify to not wanting to testify. For several months leading up to trial you told me that you did not want to testify. On the day of trial, after the State rested, you had told me that you thought you had changed your mind and wanted to testify. Again I told you that I did not think it was a good idea. And at that point I just wanted to make sure that there was no room for dispute. So I had Mr. Perri come in to witness the conversation of again going over the benefits and the risks of you testifying. And I wanted to go over that again before you made your final decision."

¶ 115    Trial counsel testified that she made it "clear" to defendant that it was not in his best interests to confess to the crime, because "the jury would be ordered to follow certain instructions, and based on those instructions, they would more likely than not find [him] guilty." This exchange followed:

> "Q. So my belief in God was in conflict with your reasoning of defense?
>
> A. I don't remember–I mean I advised you that it was not a legal defense to put forth, that there is no basis in law for the judge or anyone else to argue to the jury that you could be found not guilty because God has forgiven you.
>
> Q. So you never advised me that I have the right to speak *that which I believe in to be true?*

A. I advised you that you have a right to testify and that you could testify. I told you that. I told you it was your choice. I advised against it. I recommended that you not testify, but I did tell you that is your choice to make.

Q. So the choice was to go with your line of reasoning?

A. That was your choice that you made." (Emphasis added.)

Trial counsel affirmed again that she made it "very clear" to defendant that he had the final decision as to whether he would testify. Counsel never told defendant "that he could not testify."

¶ 116    Defendant next asked trial counsel about her decision not to argue to the trial court that defendant was unfit. Counsel had had concerns over defendant's desire to "confess on the stand," but she "never had a doubt of [defendant's] competency to stand trial." When she told her supervisors about defendant's desired course of action, they initially questioned whether defendant was "delusional." Counsel explained, "I think it's a natural questioning for someone to say to me, without meeting or talking to you, well, is this person sane." After Light spoke with defendant, however, he agreed with counsel that defendant was not unfit.

¶ 117    Trial counsel acknowledged that there were plea negotiations in the case. Defendant had agreed that, in exchange for a guilty plea to "one residential burglary or possibly two" with a total sentence of 25 years, and dismissal of the remaining charges, he would assist the police in "clearing up several burglaries that the police thought [he was] involved in." The defense had wanted the State to reduce the charges "so that [defendant] could be released and do treatment," but the State refused. Trial counsel testified further:

"A. So then at one point you indicated to me that you did want to cooperate. *After you indicated to me that you did want to take the offer and cooperate, then that's when–of course the agreement was contingent upon you clearing up these crimes. So after you indicated to me that you did want to take the agreement and cooperated, we set up meetings with the detectives.*

Q. And do you ever recall me stating anything specific I would have had you relay to the State concerning these plea negotiations?

A. I mean I guess you just wanted to make sure that they didn't want you to implicate anybody else who may have helped you. I do recall that. And they made clear that they didn't want you to necessarily give up anybody, so to speak. You wanted to make sure that they weren't going to charge you with any of these, which we made clear.

***

Q. At any point in time did I indicate if anybody had been convicted wrongfully that you would bring that to the State and let them know that there may have been people convicted wrongfully and I may have knowledge of that?

***

A. Yeah[,] you said that if you found that out, you would want me to bring that to the State's attention. You never told me–and that was the end of it. You never said that you had found anything out like that.

Q. So the officers never brought that to your attention?

A. No. And you never brought that to my attention either.

Q. So anything that I would have admitted to under plea negotiations and somebody was wrongfully convicted of that, that would be in the plea negotiations that the officers reported?

A. Well, I mean I know that you had cleared up a lot, maybe even close to a hundred residential burglaries, and I got reports that listed all of them, addresses, so there are reports of that, yes." (Emphasis added.)

Defendant then asked, "So there could be–so there could be cases that other people had been wrongfully convicted under that I may have admitted to?" The court questioned the relevance of this inquiry, and defendant replied that it was "part of our plea negotiations, and I don't believe [trial counsel] held up her part of the plea negotiations." The court sustained an objection, and defendant stated: "Well, I guess that I'm just trying to establish that I was under plea negotiations and I was under an agreement, that the agreement wasn't lived up to by the State or my defense." The State then stated that it wanted "to make clear for the record" that the State did not fail to honor the plea agreement but that it was defendant who later rejected the agreement. Defendant stated, "[T]hat is correct."

¶ 118 During argument on paragraphs 8 and 9 of his posttrial motion, defendant said:

"I believe my right to adequate counsel and to express my views and beliefs were [*sic*] denied because they weren't taken seriously and they were–I was told that it wasn't a line of defense but as–I believe under the First Amendment, right to religion and freedom of speech, she could have advised me more in a way that and encourage me to pursue those beliefs."

The trial court denied defendant's posttrial motion.

¶ 119 On December 10, 2009, the case proceeded to sentencing. Defendant's presentence report showed an adult criminal record that included convictions of burglary, residential burglary, aggravated assault of a police officer, and drug possession. In requesting the maximum sentence of 30 years, the State argued in part:

"I know the Court has reviewed the presentence report, and obviously the thing that is of most significance is the Defendant's criminal record. It appears that Defendant has pretty much been incarcerated in the Department of Corrections or jail since August of 1988.

* * *

*** [The] criminal history *** is the big and major portion of my argument here."

¶ 120 Defendant made a statement in allocution, which follows in its entirety:

"I was going to prepare a note but I decided to just go on what I know, you know, the truth. It's not always easy to say, what needs to be said, when you're in a situation like this.

Since I've been here in the county jail I've taken the steps to get involved in programs, most of them pertaining to spiritual programs. I know my past is anything but good to look at. I can even understand why the State's asking for what they are. I don't want to sit here and make excuses for anything.

-41-

I have been reading the Bible a lot, and I believe I've come a long ways, and the programs that have been offered to me I believe I took advantage of them to the best of my ability. ***

[Defendant submits a packet of documents including a photograph.]

*** The picture is of my sister's kid. I know there's a possibility it could be a long time before I see him. He means a lot to me. I guess I don't want to make excuses because I can understand where the State's coming from and everything from what they've presented, and understand why they don't want me on the street, but I can only speak for what I believe that I've done since I've been here, the programs I've been involved in, and [sic] has to do with my faith in Christ. I know no matter what sentence you send forth [sic] is going to be less than what I deserve. It says in the Bible 'for the wages of sinner [sic], death.' So I know what I deserve. However, I do put my faith and trust in my Lord Savior Jesus Christ, who paid the price for my sins. I know that doesn't justify me standing in front of you right now but I know as God sees something good in me, I hope you will.

I just want to thank you offering me the opportunity to be a part of this. I know I haven't been right all the time, I had many faults, but I'm just thankful I'm in a system like this where I had the opportunity to speak my peace [sic]. I would ask for forgiveness from all those that I have harmed. In the sense that in the past I may have been able to justify my actions, I cannot do that today, other than what I can believe in, that is my life, Jesus Savior paying for my sins.

I would just hope that you would take into consideration the time I spent here and the programs I've been enrolled in and the opportunities I've took [sic] in order to make an effort at trying to better myself. I don't believe my problem has been drugs and stuff like that. I believe my problems has [sic] been with sin. The only way I can deal with these problems is through the word of God. I'm learning that today. I'm growing in faith. And whatever sentence you decide to decide on I hope it will be merciful. I'd just like to have an opportunity some day to at least be able to seek freedom as people know it, and just apologize for taking my freedom for granted."

¶ 121   In pronouncing sentence, the trial court said in part:

"[Defendant's] asking for forgiveness from the people that he has harmed. I assume he meant harmed in the sense that he broke into their homes. You know, some religions profess that the confession of sin is good for you, that that somehow will wipe the slate clean, but there are other religions that talk about confessions of sin as well that say basically a true confession of sins, sins that are committed against God, God forgives, but when they're sins against others, God does not forgive until that person atones to those they have sinned against. You know, it's nice to say I'm sorry, I'm asking for forgiveness, but that is not enough, not just in religious terms, it clearly is not enough in secular terms, certainly before a Court that has to impose a sentence according to the dictates of the law.

*** I don't discourage you from continuing in [the prison programs], but I don't think it is enough for me to 'forgive you' for the things that you have done in your past."

¶ 122                                    3. Discussion

¶ 123    As noted, plea bargaining is so potentially beneficial to a criminal defendant that, in some cases, it might be ineffective assistance for defense counsel *not* to negotiate. Here, defendant was facing multiple pending charges, including three residential burglaries aside from the present offense. The current charge was substantiated by DNA evidence, and defendant confessed to trial counsel that he had committed the crime. The police also had evidence linking defendant to two other residential burglaries (which might or might not have been charged while the present case was pending below). Defendant was linked to the Harlem Boulevard burglary by DNA evidence. He was linked to the Euclid Avenue burglary by his possession of the stolen items and by his incriminating conduct and statements reported by his girlfriend, Swewait, and a criminal associate, Hoper. Moreover, defendant communicated, in the course of plea negotiations, that he was involved in nearly 100 residential burglaries. Given the likelihood that, if a resolution were not reached, defendant would be convicted of multiple residential burglaries, and could face up to 60 years in prison under mandatory consecutive sentencing, trial counsel negotiated with the State, as was her prerogative and, arguably, her duty.

¶ 124    Trial counsel secured an offer whereby, in exchange for defendant's plea of guilty to one or two residential burglaries and his cooperation in clearing unsolved burglaries, the State would recommend a prison term of 25 to 30 years and dismiss the remaining charges. Defendant rejected the offer, and trial counsel noted for the record that the decision was against her recommendation given defendant's potential sentencing exposure. As trial approached, defendant announced that his trial strategy was to confess also to the jury and ask that they forgive him as God had forgiven him. Trial counsel sought assistance from Light, who in March 2009, five months before trial, met with defendant and trial counsel. At their meeting, defendant confessed to the crime, as reflected in defense exhibit 3. According to trial counsel, defendant eventually dropped this peculiar trial strategy and, for several months afterward, planned not to testify. At trial, however, after the State rested, defendant informed trial counsel that he had again decided to take the stand and confess. Here, I believe, there is extra reason for refraining from assumptions as to trial counsel's reasons for conducting her defense as she did. Defendant's proposed trial strategy was so askew that he might well have told trial counsel not to challenge the DNA evidence. We simply do not know.

¶ 125    After defendant told trial counsel that he wanted to take the stand and confess, counsel enlisted Perri, and together they met with defendant. Defendant ultimately did not testify. He was convicted, and he now complains about trial counsel's performance. (Ironically, in the very process of doing so, defendant discloses the confessions he made to trial counsel, and thereby inadvertently undercuts his complaint by showing that he suffered no prejudice from counsel's performance. See Part II below.) Defendant has little basis for complaint, for his present situation is the best of a host of bad scenarios. If he had not been convicted in the present case, he almost certainly would have been convicted on one or more of the other cases and might well have received a sentence (60 years) twice as long as what he received here (30 years). We cannot ignore the nature of trial counsel's predicament in representing a client charged with multiple crimes, on some of which there was irresistibly strong

-43-

evidence. See *People v. Thomas*, 164 Ill. 2d 410, 431 (1995) (noting that defense counsel, in developing a mitigation strategy at sentencing in a murder case, had a "difficult set of facts with which to work," namely, the defendant "committed a brutal crime against a woman and had previously committed six other brutal crimes against women" and had also "lied [to counsel] about his psychological problems and family history"). Counsel performed competently at trial, yet defendant was convicted. Afterward, the State, in its discretion, dismissed the other pending charges. Viewed realistically, and without wrenching her individual acts out of context, counsel's representation was, on the whole, competent. At the end of the day, defendant did not face consecutive sentencing.

¶ 126    Even if trial counsel had performed below professional standards, I would be reluctant to agree that trial counsel was wholly responsible. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland*, 466 U.S. at 691. I would not be able to ignore the possibility that defendant's recurring desire to confess on the stand compromised trial counsel's preparation. See *Thomas*, 164 Ill. 2d at 426 (counsel's failure to discover the defendant's history of psychological problems was due partly to the defendant's and his mother's false denial that the defendant had suffered from any emotional disturbances).

¶ 127    For the foregoing reasons, I cannot agree that trial counsel's performance was unreasonable.

¶ 128                    II. Any Deficiencies in Trial Counsel's Performance
                              Did Not Prejudice Defendant

¶ 129                              A. Introduction

¶ 130    Since defendant has simply cited scholarly articles and identified no practical way in which trial counsel could have improved her challenge to the DNA evidence, I cannot agree that defendant has established prejudice. Moreover, I agree with the State that there was no prejudice also because defendant, in his statement in allocution, confessed to the crime charged. Defendant stated in part: "I know no matter what sentence you send forth is going to be less than *what I deserve*" (emphasis added). (Above, in Part I(B)(2), I set forth the entire statement.)

¶ 131    The majority suggests that defendant's statement might have pertained to his past crimes and not to the current offense. I disagree. First, defendant's choice of words clearly shows that he was confessing to the current offense. Second, the trial court's reaction to the statement shows that it interpreted it as an apology for the current offense. Third, the posttrial proceedings on defendant's ineffectiveness claim suggest that defendant's statement in allocution was the implementation of a strategy that he had proposed to take at trial, *i.e.*, confess to the current crime and seek mercy–a strategy that, he claimed, trial counsel unconstitutionally barred him from pursuing. In the course of proving his ineffectiveness claim, defendant, acting *pro se*, introduced into evidence defense exhibit 3, trial counsel's notes of her pretrial conversations with defendant. Defendant introduced this document for the express purpose of showing that he wanted to make a confession to the jury, and indeed the document contains statements that can be taken only as confessions. Thus, unrecognized

-44-

by the State, the record contains confessions other than those that defendant made in his statement in allocution.

¶ 132                                    B. Discussion

¶ 133                    1. The Notes of Trial Counsel's Discussions With Defendant

¶ 134      "A confession is a voluntary acknowledgment of guilt after the perpetration of an offense or of facts which directly and necessarily imply guilt." *People v. Green*, 17 Ill. 2d 35, 41 (1959). A confession may be classified as judicial or extrajudicial. *Id.* "A judicial confession consists of a plea of guilty to an indictment *or some similar action or conduct in a court or judicial proceeding*." (Emphasis added.) *Id.* After such a confession, a defendant "may not question the legal sufficiency of the evidence against him." *Id.* at 42.

¶ 135      Neither defendant nor the majority disputes that, when defendant introduced defense exhibit 3 into evidence to establish the truth of what was asserted therein, the document became admissible as evidence against him. See *People v. Johnson*, 44 Ill. 2d 463, 470 (1970) (when an incriminating extrajudicial statement by a third party is admitted to be true by the defendant, "the statement by adoption becomes his own and is admissible in evidence against him").

¶ 136      The majority, however, agrees with appellate counsel that defense exhibit 3 does not contain a confession to the current offense. According to the majority, defendant's statements in the exhibit are simply representations of what he was contemplating he would say if he took the stand, not what he actually affirmed or asserted to trial counsel and Light. According to the majority, "evidence that defendant discussed with his counsel confessing the crime in court does not equate to a judicial confession." *Supra* ¶ 36. As the majority sees it, defendant's statements no more amounted to judicial confessions than defendant's discussions about pleading guilty amounted to a guilty plea.

¶ 137      The majority's comparison is faulty. Trial counsel's notes consist of three pages. The first notation reads: "D. wants to testify that he was there, but it was the 'sin w/in me' that did the crime." The second notation reads: "Explained to him not a defense and not in his best interest to testify." These statements may reasonably be construed as simply reflecting what defendant would say if called to testify. The remainder of the notes, however, do not reflect strictly how defendant would testify but also appear to be statements of his present beliefs. Defendant's first statement in the remainder of the notes is that he has "been forgiven by God" and "so can't plea guilty." This statement entirely undercuts the majority's position that defendant's statements of culpability are entirely tentative or hypothetical. Here defendant is not indicating what belief he would profess to the court or the jury if he took a particular procedural course. Rather, he is indicating that his present belief, *i.e.*, that he has been forgiven, is directing his procedural options. That defendant believes he is forgiven implies that he believes he did something worthy of judgment. Defendant follows this remark with various statements such as: (1) "Law of Man does not apply to me"; (2) "I've been called to a higher purpose"; (3) "The sin w/in me committed the crime"; (4) "Wasn't me but sin that dwelled w/in me"; (5) "God uses least likely people to show prophesies. Want truth to be known"; and (6) "can convict my flesh–cannot convict my spirit." The majority refuses to

take these statements at face value, as expressions of genuine belief, but believes that defendant is the entire time testing the waters with hypothetical testimony. This is untenable. Statement (5) suggests that defendant wishes to testify to express a current belief, and the context suggests that the "truth" he wishes to express is his belief that sin was responsible for his deed and that God has forgiven him. Notably, remarks (3) and (4) were apparently what prompted Light to ask, "Ever consider the possibility that you are wrong?" When Light's question is read in context, it is clear that he saw defendant as expressing a present (and peculiar) belief about the role of sin in his acts.

¶ 138    This interpretation of the notes is corroborated by defendant's remarks at the posttrial hearing. Defendant elicited from trial counsel that he had wanted to take the stand and confess and that counsel advised him that it was not a viable defense. Defendant then asked trial counsel, "So you never advised me that I have the right to speak *that which I believe in to be true*?" (Emphasis added.) Here defendant plainly suggests that he what he planned to state on the stand was what he believed to be true, *i.e.*, that he had committed the crime but that the jury should forgive him because God has forgiven him.

¶ 139    In attempting to draw an analogy between defendant's statements as recorded in defense exhibit 3 and his acknowledgment that he contemplated pleading guilty, the majority overlooks the fact that defendant did not just contemplate taking the stand and confessing but actually did confess to trial counsel. Even in the matter of the contemplated guilty plea, there potentially are confessions that the State could use against defendant on remand. Defendant elicited substantial testimony from trial counsel about plea negotiations, including that he accepted the State's offer and, in keeping his end of the bargain, "cleared up *** maybe *** close to a hundred residential burglaries." Illinois Supreme Court Rule 402(f) (eff. July 1, 1997), generally prohibits admission of plea negotiations. This bar, however, was meant to protect the accused, and here defendant himself elicited evidence of plea discussions, in the hope of establishing trial counsel's ineffectiveness.

¶ 140                             2. Defendant's Statement in Allocution

¶ 141    The majority asserts that defendant's statement in allocution is "simply too vague to be considered a confession," as it may "be read as referring to his remorse for a life of crime generally, and not specifically to this offense." *Supra* ¶ 35. I disagree.

¶ 142    First, whether a statement constitutes a confession is determined by context. The defendant need not affirmatively articulate the crime to which he is confessing; it suffices if, knowing the nature of the allegation, the defendant makes some acknowledgment of responsibility for it. In *People v. Helm*, 69 Ill. App. 3d 78 (1979), the sheriff of Tazewell County testified to his conversation with the defendant, a sheriff's deputy, about an allegation that the deputy had assisted an inmate in committing suicide. The sheriff testified that, when he described the allegation to the defendant, he did not " 'deny that accusation.' " *Id.* at 80. The sheriff then " 'informed [the defendant] that I was conducting an investigation into the matter and that I wanted the truth; whether it could be substantiated or not.' " *Id.* at 81. The defendant " 'replied that he was sorry that it had happened; that he had not intended to cause anybody any harm; that he didn't want to cause me any [more] embarrassment; he

didn't want to cause himself any problems nor the department, again he was sorry. He continued to repeat that ***.' " *Id.* In holding that the statement constituted a confession, the appellate court noted that the defendant "was aware of the fact that he was the subject of an accusation to the effect that he had committed a serious and wrongful act." *Id.* The defendant "did not deny the accusation but instead apologized repeatedly and denied that he intended to harm anyone." *Id.* The court concluded that "the defendant's statements to [the sheriff], when viewed in their entirety, can only be construed as an acknowledgment of guilt and thereby constitute a confession." *Id.*

¶ 143    *Helm*'s reasoning applies here. At sentencing, defendant had no doubt as to the crime of which he was accused and convicted. With this knowledge, he began by remarking that he had decided to tell "the truth." He proceeded to "ask for forgiveness from all those that [he had] harmed." He acknowledged that whatever sentence the court decided to impose would be "less than what [he] deserve[d]." He stated that he could no longer "justify [his] actions." This was, under *Helm*, a clear "acknowledgment of guilt" by defendant as to the offense of which he knew he stood accused and convicted.

¶ 144    I disagree with the majority as to the breadth of the confession. Certainly, since the State had just emphasized the extent of his criminal history, defendant might well have meant to express remorse for it. As it happened, however, defendant expressed regret not only for his past crimes but also for the current offense. Thus, the statement was truly one of regret for, to the use the majority's phrase, "a *life* of crime" (emphasis added) (*supra* ¶ 35). I am not sure why the majority believes that defendant might have thought he could "obtain the most lenient sentence possible" (*supra* ¶ 35) by expressing remorse for all but the current offense, since the latter was, obviously, the primary factor at sentencing. I would think defendant would have wanted to show as much remorse as possible. Indeed, defendant took a different strategy from what the majority describes and decided to tell the "truth," as he stated at the beginning of his statement–a portion that the majority omits from its analysis. Defendant proceeded to ask "for forgiveness from *all those* that [he had] harmed." (Emphasis added.) Defendant noted that, unlike in the "past," he was now unable to "justify [his] actions." He acknowledged that any sentence he would receive from the court would be "less than what [he] deserve[d]." Defendant did not qualify the extent of his remorse. The majority simply mistakes comprehensiveness for vagueness.

¶ 145    This case is similar to *People v. Brown*, 371 Ill. App. 3d 972, 976 (2007), where the defendant was convicted of three counts of first-degree murder, six counts of unlawful use of a weapon by a felon, and one count each of armed robbery, armed violence, and conspiracy to commit armed robbery. At sentencing, the defendant stated in allocution, " 'I am sorry. I wish I hadn't done it myself.' " *Id.* After seeking relief on direct appeal, the defendant filed a postconviction claim of actual innocence. The trial court denied the claim. The appellate court affirmed, noting that the defendant had "confessed to the offenses in allocution" and that his "words contradict[ed] his *** claim of actual innocence." *Id.* at 984.

¶ 146    The defendant in *Brown* was charged with multiple crimes, but he expressed regret for having done "it," which could be taken to imply a single act. The appellate court nonetheless construed the remark as a confession to all "the offenses." Defendant's confession here was arguably more comprehensive, as he apologized to "*all* those [he had] harmed" (emphasis

added).

¶ 147    What also cannot be ignored here is the trial court's reaction to defendant's statement in allocution. The trial court noted that defendant was "asking for forgiveness from the people that he has harmed," that is, "harmed in the sense that he broke into their homes." The trial court remarked that it was "not enough" for defendant to apologize. Certainly, the trial court would have found defendant's apology even less persuasive if the court had seen it as limited to the past offenses. The court evidently viewed the apology as comprehensive, yet still inadequate. The court could observe defendant's demeanor, and so was in a far better position than this reviewing court to construe his words. See *People v. Williams*, 173 Ill. 2d 48, 67 (1996) (trial court in a better position to judge demeanor of those appearing before it and ascertaining the meaning of their remarks). The majority, however, fails even to consider, much less give deference to, the trial court's interpretation of defendant's remarks.

¶ 148    It is also vital to remember that defendant was no "babe in the woods." He had appeared before sentencing courts many times before. While he was a fool for proceeding *pro se*, his filings and performance in court demonstrate that his strategy all along was to beg for mercy, either from a jury or, in a last-ditch effort, from the trial court at sentencing. The trial court, in its wisdom, did not muzzle defendant or in any way impede him in the presentation of the posttrial issues. Trial counsel had repeatedly warned defendant that he could not confess in open court and at the same time request forgiveness. He should have listened. Instead, through his own words and through the witnesses he presented, he repeatedly confessed in open court to his guilt of the offense, and he cannot now seek relief before this court.

¶ 149    Finally, I believe that the majority's decision today simply delays the inevitable. While defendant has prevailed today, there is a strong likelihood that the State will attempt, on remand, to introduce defendant's various confessions, which, of course, include his statements at sentencing. They also include, however, defendant's remarks as recorded in defense exhibit 3 as well as whatever specific admissions about uncharged burglaries he made during the course of the failed plea negotiations. The majority should discuss whether defendant could successfully oppose the admission of the statements. I myself cannot see how he could, since he either made the statements in open court or introduced the written statements as part of his posttrial presentation.

¶ 150    For the foregoing reasons, I respectfully dissent.